**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Lezmond Mitchell,

Petitioner,

vs.

United States of America,

Respondent.

No. CV-09-8089-PCT-MHM
No. CR-01-1062-PCT-MHM

DEATH PENALTY CASE

**MEMORANDUM OF DECISION AND ORDER**

Petitioner Lezmond Mitchell, a federal prisoner under sentence of death, moves this Court to vacate his conviction and sentence under 28 U.S.C. § 2255. (Doc. 30.)[1] The Government filed a response opposing the motion, and Petitioner replied. (Docs. 49, 55.) After consideration of the motion and responsive pleadings, as well as the trial record and the numerous exhibits proffered by the parties, the Court concludes that Petitioner is not entitled to postconviction relief and that further evidentiary development is neither required nor warranted.

**PROCEDURAL HISTORY**

On May 8, 2003, a jury convicted Petitioner of first degree murder, felony murder,

---

[1] "Doc." refers to documents filed in the instant civil case. "CR Doc." refers to documents filed in the criminal case, No. CR-01-1062-PCT-MHM.

robbery, kidnapping, use of a firearm during a crime of violence, and armed carjacking resulting in death. Petitioner and the victims were members of the Navajo Indian reservation, where the crimes occurred. Under the Federal Death Penalty Act, Petitioner faced capital punishment on the carjacking conviction. Following a penalty phase hearing, the jury unanimously returned a recommendation of death as to each of the two murder victims. This Court imposed that sentence on September 15, 2003. On September 5, 2007, the United States Court of Appeals for the Ninth Circuit affirmed on direct appeal. *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007). The Supreme Court denied a petition for certiorari on June 9, 2008. *Mitchell v. United States*, 128 S. Ct. 2902 (2008).

Petitioner filed the instant motion on June 8, 2009, and an amended motion on November 12, 2009. (Doc. 9, 30.) The Government filed its response on April 1, 2010. (Doc. 49.) Petitioner filed a reply on July 7, 2010. (Doc. 55.)

## **FACTUAL BACKGROUND**

The Ninth Circuit summarized the relevant facts as follows:

> In October 2001, Mitchell, then 20 years old, Jason Kinlicheenie, Gregory Nakai and Jakegory Nakai decided to rob a trading post on the Arizona side of the Navajo Indian reservation. Mitchell and 16 year-old Johnny Orsinger set out from Round Rock, Arizona, for Gallup, New Mexico, on October 27 to look for a vehicle they could steal to use during the robbery. They bought one knife and stole another while there. Hitchhiking back to the reservation, they were picked up by a trucker who took them part of the way.
>
> Meanwhile, on the afternoon of Sunday, October 28, 2001, Alyce Slim (63 years old) and her nine year-old granddaughter, Jane Doe, left Fort Defiance, Arizona to go to Tohatchi, New Mexico where Slim hoped to secure the services of Betty Denison, a traditional medicine person, for leg ailments. It is a 35 minute drive that the two made in Slim's pewter-colored double cab Sierra GMC pickup truck. They got to Tohatchi about 4 p.m. Denison was unable to assist her, but thought another medicine woman, Marie Dale, might be able to help. She, Slim, and Jane drove to Twin Lakes, New Mexico where Slim arranged an appointment with Dale for the next day. The three returned to Denison's home where they dropped Denison off around 5 p.m., then Slim and her granddaughter left. That is the last time they were seen alive.
>
> Somewhere in route, and somehow, Mitchell and Orsinger got into Slim's truck. Slim and Jane were in front, Mitchell in the right-rear passenger seat and Orsinger in the left. Slim stopped near Sawmill, Arizona, to let Mitchell and Orsinger out of the car, but Orsinger started stabbing her with a knife and Mitchell joined in. Slim ended up being stabbed 33 times, both from the left and right, with sixteen incised wounds on her hands that indicated she fought the attack. Once dead, her body was pulled onto the rear seat. Jane

was put next to her. Mitchell drove the truck some 30-40 miles into the mountains with Jane beside her grandmother's body.

There, Slim's body was dragged out. Jane was ordered out of the truck and told by Mitchell "to lay down and die." Mitchell cut Jane's throat twice, but she didn't die. Orsinger and he then dropped large rocks on her head, which killed her. Twenty-pound rocks containing blood tied to Jane were found near the bodies.

Mitchell and Orsinger returned to the site with an axe and shovel. Mitchell dug a hole while Orsinger severed the heads and hands of Jane and Slim. Together, they dropped the severed body parts (along with Mitchell's glove) into the hole, and covered them. The torsos were pulled into the woods. Later they burned the victims' clothing, jewelry, and glasses. Mitchell and Orsinger washed the blood from the knives in a nearby stream; the next day, Mitchell also washed the knives with alcohol to remove any blood.

Jane's mother, Marlene, became concerned when Jane and Slim, who was Marlene's mother, had not returned home. She tried to call Slim on her cell phone Sunday night, then the next morning at home, but got no answer. After checking at Slim's house and Jane's school, Marlene filed a missing persons report on Tuesday.

On Wednesday, October 31, 2001, the Red Rock Trading Post, a convenience store and gas station located in Navajo territory, was robbed by three masked men. Kinlicheenie supplied the masks as well as his parents' car for use after the truck was abandoned; Mitchell carried a 12-gauge shotgun, and Jakegory Nakai had a .22 caliber rifle. Charlotte Yazzie, the store manager, was mopping the floor when one of the robbers assaulted her, striking her with his firearm and pulling her behind a desk. Watching this, another store clerk, Kimberly Allen, ducked behind shelving. A second robber saw Allen and pushed her against the counters. When Allen said she didn't know the combination to the safe, the gunman told her, "If you lie to me or you don't cooperate with us, we are going to kill you." He told Allen to turn on the gas pump. As she did, she saw a pickup truck parked outside, which she described as a double cab beige Chevrolet. Yazzie was taken into a back room where the robbers demanded, and she provided, more money. Mitchell, Nakai and Kinlicheenie emptied the cash registers and safe and then tied down Allen and Yazzie in the vault room. They made off with $5,530 and Yazzie's purse.

The robbers drove back to Kinlicheenie's car and he followed the truck to a place about a mile and a half south of Wheatfields, Arizona, where Mitchell set fire to it using kerosene stolen from the Trading Post. They returned to the Nakai residence and split the money. Mitchell got $300 from Kinlicheenie.

As it happens, a customer and his girlfriend pulled into the parking lot while the robbery was in progress and saw two of the masked gunmen, one of whom was wearing purple gloves. The customer also saw a beige, extended cab Sierra or Silverado model truck parked at the fuel tank. The customer's girlfriend took down the license plate number and gave it to one of the Trading Post employees. The next day, a Navajo police officer discovered an abandoned pickup truck a mile and a half south of Wheatfields, Arizona, within the Navajo Indian reservation. The officer detected the odor of

gasoline, and portions of the truck's interior were burned. It turned out to be Slim's 2001 GMC Sierra pickup. Criminal investigators discovered a purple latex glove and Halloween masks inside the truck, as well as Mitchell's fingerprints and Slim's blood.

Based on this information and a tip, investigators focused on Orsinger, Orsinger's father, Mitchell, Jakegory Nakai and Gregory Nakai, among others. On the morning of November 4, 2001, FBI Agent Ray Duncan conducted a briefing with criminal investigators and SWAT team officers of the Navajo Department of Law Enforcement. Tribal warrants were issued and executed at the house of Gregory Nakai. Mitchell, Jimmy Nakai, and Gregory Nakai were arrested. Mitchell had been asleep and wore only a t-shirt and shortcuts. He asked for his pants, which he told an FBI agent were near a bunk bed on the floor. As the agent was picking them up, a silver butterfly knife fell from a pocket.

Gregory Nakai and his mother, Daisy Nakai, consented to a search of the house. Two FBI agents, an evidence technician, and a Navajo criminal investigator conducted the search. They retrieved the silver butterfly knife and found a second butterfly knife with a black handle. Trace amounts of blood from the silver knife were matched to Slim. The search also turned up a newspaper that had a front page story on the Trading Post robbery, and a cell phone belonging to Slim.

Agent Duncan and a Navajo criminal investigator met with Mitchell at the Navajo Department of Criminal Investigations around 1:30 p.m. Mitchell signed a waiver of his *Miranda* rights and, after flipping a coin, agreed to talk. When asked about his whereabouts on the weekend of October 27, Mitchell stated that he had been drinking around Round Rock. He denied being involved in the disappearances and robbery. Mitchell then agreed to a polygraph examination, which FBI Special Agent Kirk conducted about 5:30 p.m. Mitchell was reminded that his *Miranda* rights still applied and he signed an FBI consent form after reading it. Kirk told Mitchell that the test results indicated he had lied. Mitchell made inculpatory statements about the robbery and agreed to a tape recorded interview after again being reminded of his *Miranda* rights. Mitchell admitted his involvement in the Trading Post robbery, and also confirmed that he was present when "things happened" to Slim and Jane. He agreed to help investigators find the bodies. The interview ended around 11:00 p.m.

Orsinger was arrested the next day, November 5, 2001, and he, too, agreed to take agents to the bodies. Orsinger had difficulty doing so, and agents called for Mitchell to be brought out. Mitchell directed Navajo police officers to the site. While there, Mitchell acknowledged to Kirk that his *Miranda* rights were in effect and agreed to answer more questions. According to the agent, Mitchell stated that he had stabbed the "old lady," and that the evidence would show and/or witnesses would say that he had cut the young girl's throat twice. Mitchell said he told Jane to "lay down on the ground and die," and that he and Orsinger then gathered rocks, and with Orsinger leading on, the two took turns dropping them on Jane's head. Mitchell indicated that he and Orsinger retrieved an axe and shovel, severed the heads and hands, buried the parts in a foot-deep hole, burned the victims' clothing, and cleaned the knives in a stream.

Mitchell was returned to tribal jail and taken before a tribal judge on

> November 7. A federal indictment was issued on November 21, and on November 29 an FBI agent picked up Mitchell from the tribal jail and drove him to the courthouse in Flagstaff, Arizona. Just before arraignment, agents read Mitchell his *Miranda* rights and obtained a signed waiver. Mitchell explained that one to two weeks before the Trading Post robbery, he had talked with Jakegory Nakai about committing a robbery. He and Orsinger hitchhiked from Round Rock, Arizona to Gallup, New Mexico to purchase liquor and while in Gallup, the two visited a shopping mall where they purchased one knife and stole another. They caught a ride to Ya Ta Hey, New Mexico, where they were picked up by an older lady and a young girl near the border. Mitchell asked to be let off near Sawmill, Arizona, and when the truck stopped, Orsinger began stabbing the woman. Mitchell admitted that he stabbed her four to five times. They put the older woman and the little girl into the back, and drove into the mountains where they dragged Slim's body out, threw rocks on the girl's head, and severed the victims' heads and hands. Mitchell said this was Orsinger's idea, because he would also have severed the feet.

*Mitchell*, 502 F.3d at 942-45.

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255(a), a federal prisoner may seek relief from his sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." A claim for relief under § 2255 must be based on constitutional error, jurisdictional error, or "a fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck*, 441 U.S. 780, 783-84 (1979) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

A § 2255 movant is entitled to an evidentiary hearing if (1) he alleges "specific facts which, if true, would entitle him to relief; and (2) the petition, files and record of the case cannot conclusively show that he is entitled to no relief." *United States v. Howard*, 381 F.3d 873, 877 (9th Cir. 2004) (citing 28 U.S.C. § 2255(b)). Vague, palpably incredible, or frivolous allegations warrant summary dismissal without a hearing. *See Frazer v. United States*, 18 F.3d 778, 781 (9th Cir. 1994).

## DISCUSSION

### I. INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

Petitioner was represented at trial and sentencing by three attorneys: John M. Sears, Esq., and Assistant Federal Public Defenders Jeffrey A. Williams and Gregory A. Bartolomei. The Government deposed each in February 2010 and appended transcripts of these depositions to its opposing memorandum. The Court has reviewed these materials as well as the substantial number of documents proffered by Petitioner in support of his claims. For the reasons set forth herein, the Court determines that counsel did not perform ineffectively at trial.[2]

**A. Legal Standard**

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, to satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

---

[2] The Court summarily rejects the Government's assertion that many of Petitioner's ineffectiveness claims are procedurally barred because they could have been raised on direct appeal. *See Massaro v. United States*, 538 U.S. 500, 509 (2003) (holding that failure to raise an ineffectiveness claim on direct appeal does not bar the claim from being brought in a § 2255 proceeding).

probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court need not address both components of the inquiry, or follow any particular order in assessing deficiency and prejudice. *Id.* at 697. If it is easier to dispose of a claim on just one of the components, then that course should be taken. *Id.*

**B. Intoxication Defense (Claim A)**

On the day of his arrest, after initially denying involvement in the disappearance of the murder victims, Petitioner gave a recorded statement to FBI and Navajo Nation investigators during which he admitted getting a ride in Slim's truck and seeing Orsinger stab Slim and cut the child's throat. During this interview, Petitioner repeatedly claimed to have been drinking and said he "blacked out" at times while in the truck. (Doc. 9, Ex. 18 at 5-9.) The next day, Petitioner led investigators to the crime scene and admitted his role in stabbing Slim, but claimed that he was so drunk at the time of the murder he could not remember how many times he had stabbed her. (Doc. 9, Ex. 20.) In a statement several weeks later, Petitioner asserted that he had consumed "a couple of forty ounce bottles of beer prior to going to Gallup" and bought more liquor once there. (Doc. 9, Ex. 21.) To his defense attorneys Petitioner claimed that he was "sober" at the time of the crimes. (Doc. 30 at 78.)

In his motion to vacate, Petitioner argues that trial counsel failed to thoroughly investigate intoxication as a defense because they did not "seek any evidence independent of their own client regarding his state of intoxication." (*Id.* at 74-75.) He asserts that, because counsel failed to uncover Petitioner's longstanding substance abuse history, they unreasonably accepted his claimed sobriety "even though it was contradicted by significant portions of the discovery and by percipient witnesses." (*Id.* at 78.) He further argues there is a reasonable probability he would not have been convicted of carjacking – the capital count – had evidence of impaired executive functioning been presented to the jury.

1. <u>Relevant Facts</u>

In support of his § 2255 application, Petitioner has proffered declarations from numerous individuals familiar with his drug and alcohol use, including co-defendants

Gregory Nakai and Johnny Orsinger. Nakai states that in the summer prior to the crimes, his "group," including Petitioner, smoked marijuana daily, ate mushrooms occasionally, and increasingly used a lot of crystal meth and cocaine.[3] (Doc. 12, Ex. 107.) Orsinger declares that in October 2001:

> We used as much drugs as we ever did, everything we could get a hold of by any means. We didn't smoke just marijuana – we always added something to our cigarettes to make the marijuana stronger. I always added cocaine and meth to my marijuana before I smoked it; I don't know exactly what Lezmond added to his marijuana but it was along those lines. By the time we got to Gallup, Lezmond and I had been awake for several days drinking beer and using drugs. We'd been awake for so many days, it felt like walking around in a cloud. It was like we were puppets, our bodies kept moving forward, but I'm not sure how.

(Doc. 12, Ex. 109 at 2-3.) Orsinger does not recall whether he spoke with anyone from Petitioner's defense team but states: "If it'd been explained to me that our drug and alcohol use, and how many days we had been awake by then, could've been helpful to my case too, I would've provided the information in this declaration." (*Id.* at 3.)

Petitioner has also proffered a declaration from Vera Ockenfels, a licensed attorney who served as the mitigation specialist for Petitioner's defense team. She asserts that she prepared an exhaustive study of Petitioner's social and psychological background and reported to counsel that Petitioner was addicted to alcohol and drugs and had been abusing drugs since age eleven. (Doc. 30, Ex. 131 at 2.) According to Ockenfels, "there was substantial evidence that Mitchell was drunk and high on drugs at the time of the killings." (*Id.* at 3.) Her declaration does not specifically identify this evidence but refers to "government-provided discovery." (*Id.*) Ockenfels also claims that she recommended defense counsel interview Orsinger about whether he and Petitioner had consumed alcohol and drugs prior to the killings but that counsel said Orsinger's lawyer would not permit such an interview. According to her declaration, she later learned that the defense investigator,

---

[3] Jakegory Nakai, Jimmy Nakai, and Padrian George (who lived with the Nakais but was not charged in the crimes) similarly attest to the increased use of drugs and alcohol between August and November 2001. (Doc. 30, Exs. 136 & 137; Doc. 12, Ex. 100.)

Karl Brandenburger, had in fact interviewed Orsinger.[4]

In his deposition, Jeffrey Williams states that he and Petitioner's other lawyers investigated the viability of an intoxication defense. Williams spoke with Petitioner about his drug and alcohol history, and reviewed Ockenfels's report:

> I thought the drug use was primarily marijuana. I know he experimented with some harder stuff. But I was never under the impression that he was addicted to meth or coke. In fact, I think I recall meth was probably just getting on the reservation back then. It wasn't very common.

(Doc. 49, Ex. 1 at 30; *see also id.* at 17.) In addition, counsel confronted Petitioner with his post-arrest statements to the FBI about blacking out. (*Id.* at 17-18.) Petitioner "adamantly" denied being under the influence of anything at the time of the crimes; "[i]n fact, there was some discussion about making sure they were clear-headed." (*Id.* at 33.) Williams also attempted to interview co-defendant Orsinger, but Orsinger's attorney refused the meeting. (*Id.* at 20, 93.) Williams was also unaware of anything in Orsinger's statement to investigators indicating that he or Petitioner had been under the influence of intoxicants at the time of the offense. (*Id.* at 22.) Finally, counsel looked at the crime scene photos but could find no corroborating evidence of drinking or drug use. (*Id.* at 58.) In Williams's view, a defense of intoxication "wasn't even close." (*Id.* at 32.)

According to counsel Gregory Bartolomei, Petitioner "made it clear that he had not been ingesting or drinking the day of the crime and the whole period of time right through." (Doc. 49, Ex. 2 at 9-10; *see also id.* at 26-27, 38.) Thus, although Ockenfels viewed Petitioner's substance abuse as a problem, counsel could not relate it to the date of the crime; counsel said "it didn't seem to apply." (*Id.* at 21.) Bartolomei also states that Ockenfels was mistaken about Orsinger being interviewed by Brandenburger. (*Id.* at 22-23, 75.) Rather, Brandenburger delivered a subpoena during trial but Orsinger refused to testify. (*Id.* at 23,

---

[4] Petitioner has proffered a declaration from a habeas investigator, who interviewed Brandenberger. (Doc. 12, Ex. 123.) She claims that Brandenberger said he interviewed Orsinger prior to trial and referred her to his notes because "he remembered nothing about the interview." (*Id.* at 2.) However, it appears Brandenberger's notes are missing. (*See* Doc. 30 at 74 n.9; Doc. 49, Ex. 2 at 63.)

75; *see also* RT 5/6/03 at 3332-34.)

Counsel John Sears similarly states that Petitioner denied being intoxicated: "What sticks in my mind is the idea that by the time they were on the road and picked up by the victims in this case, he said they were not high." (Doc. 49, Ex. 3 at 76.) Sears further states that the defense team opted against an intoxication defense, not only because there was little supporting evidence, but because it would have contradicted the theme that Petitioner "was a good person led astray under circumstances" and that co-defendant Orsinger was the impetus for the violence. (Doc. 49, Ex. 3 at 12, 14-15.) He explains:

> There was a particular concern – this case arose not long – went to trial not long after September 11. And based on the extensive jury selection process and the questionnaire responses that were generated, I personally observed [what] I thought was a real hardening and real shift in the attitude of the potential jurors and the seated jurors about lots of things that, historically, I had used in other capital cases and that, put in simplest terms, that things that you would say about a defendant, about a defendant's background or a defendant's mental challenges by way of explanation or even a defense in 2003 were likely to be looked at as excuses for terrible conduct and would be negative.
>
> . . . .
>
> And I was not comfortable and would not have been comfortable going forward with an argument not simply because – that he was intoxicated and impaired at the time of the offense [–] not because I was concerned about what the truth was. The decision really was more nuanced than that. The decision was based, in part, on that and our belief that he was more likely to be telling us what really happened in private than puffing himself up for Johnny Orsinger, but more to the question of whether this was a winning defense to present to the jury.
>
> In the context of 2002-2003, given what had happened and who had died and how they died, we made a collective decision, I believe, that ultimately that the best defense was simply that this was Johnny, that Johnny – this was – everything about this crime, the way it was committed, why it was committed, the senselessness of it, all those things were Johnny Orsinger and not Mr. Mitchell.
>
> And the presentation of this "We were all drunk," "We were all high," or some combination of that or "blacking out" didn't fit in our minds with that argument. I don't know that we saw it as an either/or proposition, that you could only present one.
>
> But we concluded that strategically it just didn't make any sense to argue this is what happened, this is how it happened. But "By the way, I don't really remember because I was blacking out," we just didn't see that as an appropriate way to present that information to the jury.

(*Id.* at 35, 77-78.)

2. Analysis

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable." *Id.* at 690. Moreover, "[t]he law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1422 (2009). Here, Petitioner has not shown that counsel's representation fell below an objective standard of reasonableness.

First, the record establishes that counsel reasonably investigated the viability of an intoxication defense. They spoke with their client, who adamantly denied being intoxicated at the time of the offense, despite his statements to law enforcement that he had been drinking. They reviewed the crime scene photos, looking for corroborating evidence such as beer or liquor bottles. They enlisted a social historian, who gathered records, investigated Petitioner's background, and documented his substance abuse history. (Doc. 43, Ex. 93 at 32-33.) They also enlisted mental health experts to evaluate him. (Doc. 43, Ex. 94 at 15-16; Doc. 49, Ex. 1 at 16-17.) They tried to get information from co-defendant Orsinger, who refused to cooperate and invoked his Fifth Amendment right not to testify. (*See* RT 5/6/03 at 3327-34.)

Given these efforts, this case is clearly distinguishable from *Jennings v. Woodford*, on which Petitioner relies. In *Jennings*, the Ninth Circuit found ineffectiveness where counsel failed to perform a thorough investigation or consult with his client before settling on a weak alibi defense. 290 F.3d 1006, 1013-16 (9th Cir. 2002). Specifically, the court faulted counsel for failing to obtain and review voluminous medical records, investigate his client's family history, seek the appointment of experts to evaluate his client's mental state, follow up on a report from his client's ex-wife that the defendant had once attempted suicide and was diagnosed as schizophrenic, talk to his client or others about his drug use, or investigate past involuntary commitments. Petitioner's counsel, by contrast, conducted a

thorough investigation before making a tactical decision to forgo an intoxication defense.

Second, the choice not to present a voluntary intoxication defense was reasonable given the lack of evidentiary support. *See Williams v. Woodford,* 384 F.3d 567, 617 (9th Cir. 2004) (finding no ineffectiveness for failing to assert diminished capacity defense given lack of credible evidence of contemporaneous drug use). It is undisputed that Petitioner and Orsinger were the only individuals involved with the carjacking and murders and were, therefore, the only eyewitnesses who could provide any specific details about alcohol and drug consumption at the time of the offense. However, Petitioner denied being intoxicated and chose not to testify. There was nothing in Orsinger's statements regarding drug or alcohol use, and in any event Orsinger refused to testify.[5] Petitioner did tell investigators he was "too fucked up that night" to remember where they went to dump the bodies, how they got back to the road afterwards, or what happened to the truck after they got back to town. (Doc. 9, Ex. 18 at 5-9.) However, Petitioner had no difficulty later leading authorities to the crime scene in a remote, undeveloped area.[6] And although counsel could have presented witnesses familiar with Petitioner's substance abuse history, including his alleged escalating use of alcohol and drugs in the months or even days preceding the offense, such evidence would not have been particularly probative of his mental state on the day in question.

Finally, counsel's decision to focus on reasonable doubt and "Johnny did it" defenses in lieu of voluntary intoxication was not unreasonable. Although these defenses were not

---

[5] Orsinger claims now, in a post-conviction declaration, that he and Petitioner had been awake for days drinking beer and using drugs prior to the offense. However, this information was not available at the time of trial, and counsel cannot be faulted for failing to discover it given Orsinger's counsel's refusal to consent to an interview with Petitioner's counsel. *See Strickland*, 466 U.S. at 689 (observing that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").

[6] Darrell Boye, a Navajo Nation investigator, testified at the voluntariness hearing that Petitioner directed them to a remote sheep camp off of a logging road and that while en route giving directions Petitioner repeatedly recognized various landmarks such as a mobile home, a trash pit, and a specific tree. (RT 1/30/03 at 64-65.)

necessarily inconsistent, "[e]vidence of drug and alcohol abuse is a 'two-edged sword,' and a lawyer may reasonably decide that it could hurt as much as help the defense." *Housel v. Head*, 238 F.3d 1289, 1296 (11th Cir. 2001) (internal citation omitted). Sears explained that in his experience there had been a "shift in the attitude" of juries against using excuses such as drunkenness to explain terrible conduct. (Doc. 49, Ex. 3 at 35, 77-78.) Williams said he was concerned about losing credibility with the jury by, for example, saying Petitioner was not at the scene when he clearly was there: "I was concerned about losing them in the guilt phase and then not having them at all for the sentencing phase." (Doc. 49, Ex. 1 at 31.) Thus, counsel strategically chose to try to preserve their credibility with the jury by not asserting a defense they thought would fail. *Cf. Williams*, 384 F.3d at 618 ("We cannot fault [counsel's] reasonable strategic decision to capitalize on any lingering doubts of the jurors and to keep from them mental-state and drug-use evidence that might jeopardize their lingering doubts.").

Given the weaknesses in the voluntary intoxication defense, counsel's strategic choice not to pursue that defense was reasonable and does not constitute an action outside the range of professionally competent assistance. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

**C. Custodial Statements (Claim E)**

Petitioner contends that counsel were ineffective in failing to assert that Petitioner's *Miranda* waiver was involuntary as a result of his mental deficiencies and cultural heritage in combination with the investigators' interrogation techniques. (Doc. 30 at 131-32.) The Court disagrees.

Before trial, defense counsel enlisted the services of Dr. Barry Morenz, an Associate Professor of Clinical Psychiatry at the University of Arizona Health Sciences Center. Dr. Morenz met with Petitioner twice between October 2002 and January 2003, had him examined by a neuropsychologist and neurologist, and arranged for a brain imaging study, an MRI, and an EEG. (Doc. 43, Ex. 94.) The neurological exams were all normal; the

neuropsychological testing revealed some mild deficits in executive functioning, which Dr. Morenz opined might contribute to Petitioner being more impulsive in his actions. (*Id.* at 18-19.) Dr. Morenz also noted that Petitioner communicated "more articulately and intelligently" than he had anticipated based on listening to the taped police interview and stated that his "cognition was grossly intact." (*Id.* at 17.)

Defense counsel Bartolomei testified in his deposition that nothing in Morenz's report raised any questions in his mind concerning the voluntariness of Petitioner's statements. (Doc. 49, Ex. 2 at 58.) Sears observed that Petitioner "was engaged, appropriate, understood, or at least appeared to understand all of what was being discussed in his presence. I thought he was a particularly intelligence [sic] person given his background circumstances." (Doc. 49, Ex. 3 at 20.) In his deposition, Williams acknowledged that there was no evidence to suggest Petitioner did not know what he was doing when he waived his rights or that he did not understand what he was waiving. (Doc. 53 at 4-5.) Out of an abundance of caution counsel requested a voluntariness hearing, but he did not "remember anything that was suggested that the statements were in any way involuntary." (*Id.* at 5.)

At the pretrial voluntariness hearing, Petitioner testified and acknowledged being advised of his rights and signing waiver forms. (RT 1/30/03 at 126, 132.) He asserted that he agreed to cooperate because the FBI agents said it would benefit him at sentencing. (*Id.* at 119-20.) Counsel argued that the Government had coerced Petitioner's statements through the use of polygraph testing, crime scene confrontation, and the delayed filing of charges in federal court. (RT 1/31/03 at 42-49.) Counsel further remarked that Petitioner was an "[u]neducated, unskilled, unsophisticated young [man] living in a remarkably remote third-world environment on the eastern part of the Navajo Reservation" and that FBI agents had promised benefits in exchange for his cooperation. (*Id.* at 52, 60.)

The record establishes that counsel investigated Petitioner's mental capabilities and discovered nothing to indicate that his custodial statements were involuntary due to lack of intelligence or other cognitive infirmity. Nor did Petitioner suggest that, due to his Navajo upbringing, he misunderstood or was unaware of the rights he waived. Rather, he testified

that he knowingly agreed to waive his rights in the hope of receiving a lighter sentence or other benefit in exchange for his cooperation. The Court concludes that counsel's actions in challenging voluntariness based on interrogation techniques and Petitioner's lack of sophistication were well within the parameters of reasonable professional assistance guaranteed by the Sixth Amendment. Given the paucity of evidence suggesting that Petitioner suffered from mental deficiencies or that his Navajo heritage impacted his ability to understand his rights, counsel were not deficient for failing to assert these additional grounds in support of their involuntariness argument.

Moreover, Petitioner has not shown a reasonable probability that his statements would have been suppressed had counsel proffered the available mental health and cultural evidence gathered by Dr. Morenz and the mitigation specialist. There is simply no evidence to support the claim that Petitioner's statements were not knowing, intelligent, and voluntary. Thus, the failure to introduce evidence of his alleged deficiencies and Navajo upbringing did not prejudice him. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1080-81 (9th Cir. 2000).

**D. Medical Examiner (Claim F)**

Petitioner told FBI agents that "the evidence would probably show or the witnesses would say that he had cut the throat of the young girl twice." (RT 4/30/03 at 2727.) He also admitted that both he and Orsinger took turns dropping large rocks on the girl's head and that Orsinger then used an axe to sever the victims' heads and hands. (*Id.* at 2727-28.)

After her initial examination of the child's body, the medical examiner, Dr. Jerri McLemore, spoke with one of the FBI agents, who asked her to look for any cut marks on the child's neck. (RT 5/6/03 at 3267.) A second examination revealed a small incise wound that was partially obscured by the postmortem decapitation. (*Id.* at 3267-68.) Although Dr. McLemore made this discovery, the agent wrote in his report that she had attributed the finding to a forensic anthropologist. (*Id.*) Relying on the agent's report and having not interviewed Dr. McLemore before trial, defense counsel moved in limine to preclude her from testifying about a wound she had not observed. It was only then that defense counsel learned through voir dire of Dr. McLemore that the forensic anthropologist referenced in the

agent's report had consulted with Dr. McLemore only about the bones in the victim's neck and hands and that it was McLemore who had discovered the soft tissue neck injury. (*Id.* at 3268.)

Dr. McLemore ultimately testified that the child died as a result of multiple blunt force injuries to the head. (RT 5/6/03 at 3340-48.) She could not assess the depth of the incised neck wound but described it as being consistent with having a sharp object drawn across the skin. (*Id.* at 3322, 3337-39, 3353.) According to Petitioner, however, McLemore listed "neck injuries" in the "cause of death" section of her autopsy report. (Doc. 30, Ex. 139.)[7]

Petitioner argues that counsel were ineffective for failing to interview Dr. McLemore before trial and thus were unprepared to "challenge the ambiguity in her testimony and contradictory autopsy report." (Doc. 30 at 133-34.) He alleges that counsel missed an opportunity to infer bias "in McLemore's over-inclusiveness of neck wounds as a contributing cause of death," and asserts that jurors with reasonable doubt whether Petitioner hit the child's head with a rock were left to speculate whether she could have died from the knife wounds he had inflicted. (*Id.*) He also faults counsel for relying on the FBI agent's report which erroneously credited a forensic anthropologist with discovery of the neck wound. (*Id.* at 134.)

Contrary to Petitioner's assertion, the Government did not argue or suggest to the jury that the child died as a result of the incised neck wound. Rather, this evidence served only to corroborate Petitioner's own statement that he had cut her throat before he and Orsinger dropped rocks on her head. In addition, Dr. McLemore's autopsy report was not admitted into evidence, so the jury was unaware of any "ambiguity" or "conflict" from her identifying without specificity "neck injuries" in the "cause of death" section of her report. (*See* CR Doc. 322 (Exhibit Lists).)

---

[7] Petitioner did not include a copy of Dr. McLemore's autopsy report in his supporting exhibits but did obtain a declaration from a forensic pathologist who had reviewed it. (Doc. 30-2, Ex. 139.) In assessing Petitioner's claim, the Court has assumed the accuracy of this pathologist's description of Dr. McLemore's report.

In his deposition, defense counsel Williams stated that there was no question concerning the cause of the child's death and acknowledged that he was "comfortable" with the information he had concerning Dr. McLemore's anticipated testimony. (Doc. 49, Ex. 1 at 40-41.) He did not recall why he did not interview her before trial, but did not believe she had anything to contribute to the defense's theory of the case. (*Id.* at 42.) Williams further explained that given the gruesomeness of the medical examiner's testimony and photographs, he wanted to minimize her time on the stand. (*Id.*) Sears also did not recall why they chose not to interview McLemore, except to say that the defense theme "was aimed at Johnny Orsinger did it as opposed to how these people died. I came away with the conclusion that there was very little question about how they died, particularly when their heads were cut off." (Doc. 49, Ex. 3 at 55.) He was also "convinced" that McLemore was not going to say that Petitioner "inflicted some particular injury;" rather, her testimony would be limited to the injuries sustained by the victims. (*Id.* at 57.) Thus, the decision not to interview her before trial "probably had to do with what we thought was our ability to make the points we wanted to make on cross-examination simply from [her] report." (*Id.* at 56.)

It is evident from this record that counsel's decision not to interview Dr. McLemore fell within the wide range of reasonable professional assistance. There was no dispute as to the cause of death – blunt force head trauma; thus, Dr. McLemore's credibility on this point was not at issue. In addition, there was no dispute that the young girl had an incised neck wound. Admittedly, a pretrial interview with the medical examiner would have corrected defense counsel's erroneous belief that it was an unqualified forensic anthropologist who had made the discovery. However, Petitioner does not challenge that the wound existed, and it was the fact of the wound (not the circumstances of its discovery) that was most damaging to the defense case because it corroborated Petitioner's statement that he had cut the girl's throat. Therefore, Petitioner cannot establish prejudice from counsel's failure to interview the medical examiner before trial.

**E. DNA Evidence (Claim G)**

On appeal, Petitioner challenged the admission of "confusing, misleading, and

irrelevant DNA testimony" from the Government's expert, Benita Bock. *Mitchell*, 502 F.3d at 969. The Ninth Circuit considered "the coherence of the expert's explanation of what constituted a 'match,' an 'exclusion,' and a 'cannot exclude'" and determined that admission of her testimony did not constitute plain error:

> According to the government's expert, a "match" exists when the person possesses all 14 of the "alleles" (DNA sequence segments) taken from a sample at different "loci" (positions on a chromosome), but the person is "excluded" when he possesses none of the alleles taken from the sample. Mitchell's complaint centers on confusion about what it meant that a person "could not be excluded." Undoubtedly the expert's explanation was not a model of clarity. She basically said it meant that alleles of more than one person are present in the sample, yet never clearly articulated what exactly the fact that a person cannot be excluded from a sample says about the probability that the person's DNA is present in the sample, or how likely it would be that a person would possess any given number of alleles in a mixture and yet still not have contributed the DNA.
>
> Mitchell suggests that "cannot exclude" is the very definition of non-probative. Thus, he submits, evidence beyond that matching Slim's blood to the truck and knives found in the Nakai house, and matching Doe's blood to the rocks, should not have been admitted because it told the jury nothing. We do not agree; the expert's testimony indicates that a "cannot exclude" finding can tell a lot, and can increase the probability that the person's DNA is present, depending on the number of loci at which the person cannot be excluded.
>
> Apart from the evidence that Mitchell concedes was properly admitted, the jury was told that there was a mixture of at least three persons' DNA on the black butterfly knife from which the expert concluded that Mitchell and Jakegory could not be excluded at all 14 loci, Slim could not be excluded at 13 of the 14, and Orsinger's father and Gregory Nakai also could not be excluded; that there was a mixture of at least two people on the chrome knife, and Slim matched the major component at all 14 loci, which would be expected to occur in 1/650 billion Navajos; that Mitchell could not be excluded at 12 of 14 loci on Slim's cell phone; that Mitchell could not be excluded from a Halloween mask because he had some of the alleles found, but alleles he could not have produced were also present; and that Mitchell could not be excluded as a contributor at all six loci that could be tested on a glove buried with the body parts. The jury likely understood from this evidence that DNA linked Mitchell to the black knife and Slim's cell phone, and somewhat linked him to the mask and glove. It definitely connected Slim's blood to the chrome knife found in Mitchell's pants. In sum, Mitchell has shown no plain error.

*Id.* at 969-70.

In these proceedings, Petitioner contends that defense counsel's handling of the DNA evidence was constitutionally deficient because they failed to elicit an explanation of the relevance of statistical probability analysis from either Bock or a defense expert. As a result,

the jury "had to speculate whether a given set of statistics applied equally to all samples in evidence" even though not all of the DNA profiles matched at all 14 loci. (Doc. 30 at 138, 140.) He further asserts that counsel asked Bock leading questions that improperly identified either Petitioner or one of the victims as a source of the DNA found on crime scene evidence and failed to challenge Bock's and the prosecutor's repeated references to a DNA "match" with either the victims or Petitioner. (*Id.* at 141-42.) Finally, he alleges based on habeas counsel's review of the trial file that the Government provided the defense with test results for only four of the 11 samples introduced at trial, thus inhibiting their ability to review the testing for accuracy and to cross-examine Bock, and criticizes counsel's failure to obtain independent testing of the samples.[8] (*Id.* at 144.)

In their depositions, Williams and Sears testified that Petitioner's statements obviated any defense based on his not being present. (Doc. 49, Ex. 1 at 31, 89; Doc. 49, Ex. 3 at 26-27.) Consequently, counsel believed

> the most we could say on behalf of Mr. Mitchell was that, although he was there, the horrible behavior in this case was instigated by and almost entirely carried out by Johnny Orsinger and that Mr. Mitchell's presence there seemed to have somehow been part of a plan to ride herd on Johnny Orsinger to keep him from doing what he ultimately did, that the plan as we came to understand it was simply to get a truck to use in [the trading post] robbery and not to kill people in the course of doing that.

(Doc. 49, Ex. 3 at 44.) In his statements Petitioner also admitted stabbing Slim a number of times, taking the victims into the mountains, and being there when the child was murdered. In addition, blood on the chrome knife found in Petitioner's pants matched Slim's DNA at all 14 loci. Thus, counsel did not think "it was plausible or possible under the circumstances to say that Mr. Mitchell had no role in the murders" and it made no sense to attack the DNA

---

[8] In his reply brief, Petitioner expands this claim and argues, for the first time, that counsel were ineffective for providing "an unreasonable and unsound defense regarding fingerprint identification evidence." (Doc. 55 at 38.) Petitioner's attempt to raise a new claim in his reply is improper. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Moreover, this new allegation was not filed within the one-year limitation period set forth in 28 U.S.C. § 2255(f). Accordingly, Petitioner's belatedly-raised claim concerning counsel's handling of the fingerprint evidence cannot serve as a basis for habeas relief.

evidence because

> the idea that we would somehow be suggesting to the jury that Mr. Mitchell wasn't there or that he was sitting quietly while Mr. Orsinger committed all these crimes, there was just too much evidence putting Mr. Mitchell in contact with the knives and putting Mr. Mitchell at the stabbing, at the carjacking, and at the subsequent mutilation of the bodies.
>
> . . . .
>
> . . . [T]he DNA evidence in this case was not likely to produce an argument that was completely exculpatory to Mr. Mitchell, that it was not – that it was simply part of the Government's evidence against Mr. Mitchell, that their case was not based on the DNA evidence completely.
>
> So I can't – I can't say for you that the DNA evidence was contradictory to the defense that we put on at trial. We were simply trying to demonstrate to the jury that Mr. Orsinger was the person with this prior behavior. Mr. Orsinger was the person that inflicted the majority of the wounds. Mr. Orsinger was the wild card in this transaction.
>
> It was not, in our judgment, appropriate or productive for us to argue that Mr. Mitchell either wasn't there or didn't handle the weapons or didn't participate in the [trading post] robbery.

(Doc. 49, Ex. 3 at 45-46; *see also* Doc. 49, Ex. 1 at 45, 89.) Because Petitioner's case did not hinge on the DNA evidence, counsel were not particularly focused or concerned with the possibility Bock would somehow overstate the results of her investigation. (Doc. 49, Ex. 3 at 48.) Counsel also recalled no problems with disclosure concerning DNA test results. (Doc. 49, Ex. 1 at 90; Doc. 49, Ex. 3 at 57.)

The record clearly establishes that counsel made a strategic choice not to confront the DNA evidence, which was hardly the linchpin of the Government's case. Petitioner's "disagreement with trial counsel's tactical decision cannot form the basis for a claim of ineffective assistance of counsel." *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001). Moreover, Petitioner has not shown that retention of a defense DNA expert, retesting of the samples, or more extensive cross-examination of Bock would likely have resulted in either the development of exculpatory evidence or the exclusion of the Government's evidence. *See Leal v. Dretke*, 428 F.3d 543, 549 (5th Cir. 2005). Rather, he only speculates that such steps would have been helpful. "Such speculation, however, is insufficient to establish prejudice." *Wildman*, 261 F.3d at 839.

**F. Jury Selection (Claim H)**

Petitioner contends that trial counsel's representation was deficient because they failed to challenge or appropriately question Venirepersons 55, 59, and 83, and failed to adequately challenge seated Jurors 43 and 48 as well as Alternate Juror 51. (Doc. 30 at 149.) He further argues that counsel made "almost" no attempt to rehabilitate any juror who expressed opposition to capital punishment. (*Id.* at 151-53.) Finally, he alleges that appellate counsel was ineffective for not arguing on appeal that this Court had improperly excused Native American venirepersons due to their alleged opposition to the death penalty and the fact that Navajo was their first language. (*Id.* at 154.) The Court finds each of these allegations meritless.

1. Venirepersons 55, 59, and 83

"The conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.'" *Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) (citing *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)). Consequently, counsel are accorded particular deference when conducting voir dire. *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Their actions are considered to be matters of trial strategy, and a "strategic decision cannot be the basis for a claim of ineffectiveness assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.*

With respect to venirepersons 55, 59, and 83, Petitioner offers only conclusory allegations of deficient performance unsupported by legal argument. These "fall far short of stating a valid claim of constitutional violation." *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995). Moreover, none of these individuals sat as jurors in this case. Thus, Petitioner cannot demonstrate prejudice from counsel's failure to challenge them because "the Supreme Court has made clear that a court's failure to strike for cause a biased veniremember violates neither the Sixth Amendment guarantee of an impartial jury, nor the Fifth Amendment right to due process when the biased veniremember did not sit on the jury." *Mitchell*, 502 F.3d at 954 (citations omitted).

2. Jurors 43, 48, and 51

Petitioner argues that counsel should have challenged for cause or exercised a peremptory strike against these jurors because 43 believed that life without the possibility of parole was a more severe sentence than death (RT 4/11/03 at 1333), 48 felt the death penalty was appropriate when "[t]here was no regard at all for human life" (RT 4/15/03 at 1502), and 51 gave contradictory answers about whether, if Petitioner was convicted, he would go into the penalty phase thinking that Petitioner deserved to die (RT 4/23/03 at 2048-50).

Petitioner again fails to provide any substantive legal argument to demonstrate counsel's deficiencies with regard to these jurors. Moreover, the Court concludes that counsel made a reasonable strategic decision not to challenge the jurors. Juror 43 stated unequivocally on more than one occasion that he would keep an open mind and would wait to hear all of the evidence and instructions before deciding on an appropriate sentence; he also stated that he had no moral, religious, or personal beliefs that would prevent him from imposing either the death penalty or life imprisonment. (RT 4/11/03 at 1333-35.) Juror 48 similarly claimed she had no beliefs that would interfere with her ability to impose sentence and that she could imagine herself voting for a punishment other than death if Petitioner were convicted. (RT 4/15/03 at 1492-93, 1503.) Finally, with respect to Juror 51, it is evident from the transcript that the juror did not understand counsel's initial question. After clarification, he stated that he would not prejudge the punishment issue if Petitioner was found guilty and that he could imagine voting for a sentence other than the death penalty. (RT 4/23/03 at 2049-50.)

3. Rehabilitation of Prospective Jurors

Petitioner asserts that defense counsel "failed entirely, or almost entirely, to attempt to rehabilitate a substantial number of prospective jurors in this case." (Doc. 30 at 151.) He contends that counsel either failed to test jurors' stated opposition to the death penalty or failed to reexamine jurors after the prosecution led them to give disqualifying answers. (*Id.*)

Defense counsel Sears conducted the vast majority of the voir dire for the defense.

He observed the demeanor of the potential jurors and had access to additional information from each of their questionnaires. During individual voir dire, Sears actively questioned all of the prospective jurors and tried on numerous occasions to rehabilitate jurors he perceived to be favorable to the defense. This Court observed counsel's actions over the course of 13 days of jury selection and readily concludes that his conduct during voir dire was reasonable and vigorous, and did not "permeate[ ] the entire trial with obvious unfairness." *Hughes*, 258 F.3d at 457 (6th Cir. 2001); *see also Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006).

4. <u>Venirepersons 3, 6, 22, and 24</u>

In his opening brief on appeal, Petitioner raised numerous issues concerning jury selection. *See Mitchell*, 502 F.3d at 949-59. One of these asserted that Venirepersons 3, 22, and 24 were improperly excused on the basis of race. *Id.* at 953. In his appellate reply brief he also argued that, under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), they were improperly excused on the basis of their opposition to the death penalty. The Ninth Circuit deemed this argument waived because it was not contained in the opening brief. *Id.* at 953 n.2. Petitioner now contends that appellate counsel was ineffective for failing to properly challenge the dismissal of Venirepersons 3, 22, and 24, as well as Venireperson 6, due to their alleged opposition to the death penalty.

The Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). A claim of ineffective assistance of appellate counsel is reviewed under the standard set out in *Strickland*. *See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). A petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

Although the appellate court declined to address Petitioner's *Witherspoon* argument directly, in analyzing his race-based argument it concluded that the removal of Venirepersons 3 and 22 based on their perceived inability to set aside their opposition to the death penalty

was "well-supported in the record" and that this Court did not err in removing Venireperson 24 based on his beliefs against sitting in judgment of another Navajo. *Id.* at 953. In addition, Venireperson 6 was unequivocal in her repeated assertions that she would not vote for the death penalty under any circumstance. (RT 4/2/03 at 191-92, 197.) On this record, Petitioner cannot show that appellate counsel's failure to challenge the removal of Venirepersons 3, 6, 22, and 24 was objectively unreasonable or that he was prejudiced thereby.

Petitioner also asserts ineffectiveness based on appellate counsel's failure to properly raise a challenge to the Court's excusal of Venirepersons 1, 2, 9, and 11, in part due to their use of Navajo as a first language, without providing interpreters. Counsel summarily mentioned the issue in a footnote in the opening brief, but the Ninth Circuit found this insufficient to raise the claim on appeal. *Mitchell*, 502 F.3d at 954 n.2. Petitioner does no better here. Other than one citation to a case based on the New Mexico Constitution's guaranteed right of every citizen to sit on a jury regardless of the "inability to speak, read or write the English or Spanish languages," *State v. Rico*, 52 P.3d 942, 943 (N.M. 2002) (quoting N.M. Const. art. VII, § 3), Petitioner provides no authority that a federal court must provide interpreters to potential jurors with difficulty understanding the English language, especially in light of the Jury Service and Selection Act's requirement that all jurors be proficient in English. *See* 28 U.S.C. § 1865(b)(2); *cf. People v. Lesara*, 206 Cal.App.3d 1304, 1309-10 (Cal.App. 1988) (finding constitutional state requirement that jurors possess sufficient knowledge of English and rejecting argument that California Constitution requires that jurors with limited English be provided interpreters). Counsel's failure to adequately present this claim in the appellate brief does not establish constitutionally deficient representation. *Gustave*, 627 F.2d at 906 ("There is no requirement that an attorney appeal issues that are clearly untenable.").

**G. Buttons Worn by Victims' Family (Claim T)**

At some point during trial, defense counsel Williams saw some members of the victims' family sitting in the courtroom wearing "In Memory Of"-type buttons and asked the prosecution to have the buttons removed. (Doc. 49, Ex. 1 at 58-59, 78.) The Government

complied, and the issue was "resolved relatively quickly." (*Id.* at 59.) Counsel notified the Court the following week in connection with a different matter. (RT 5/6/03 at 3409-10.) According to Williams, the button was not very big and he "would have had to have been fairly close" to have seen it. (Doc. 49, Ex. 1 at 79.) On appeal, the Ninth Circuit concluded that the button display did not deprive Petitioner of a fair trial. *Mitchell*, 502 F.3d at 971-72.

In these proceedings, Petitioner argues that counsel were ineffective for not objecting to the buttons in a timely manner. (Doc. 30 at 226.) He asserts that the issue should have been brought to the Court's attention immediately instead of defense counsel working out the issue informally with the prosecution. (*Id.*) However, it was within counsel's broad discretion to resolve the issue with the Government without involving the Court. Moreover, according to counsel, the buttons were difficult to see without being close to the wearer. The Court can discern neither deficient performance nor prejudice from counsel's actions in this regard.[9]

**H. Trial Trifurcation (Claim U)**

Under the Federal Death Penalty Act, a "separate sentencing hearing" shall be held to determine the punishment to be imposed. 18 U.S.C. § 3593(b). At this hearing, the parties may submit information "as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered." 18 U.S.C. § 3593(c). The jury must unanimously find beyond a reasonable doubt the existence of at least one statutory aggravating factor under § 3592 and one "gateway intent" factor under § 3591 to render a defendant eligible for the death penalty ("eligibility decision"). 18 U.S.C. §§ 3591(a) & 3593(c)-(d). Assuming this occurs, the jury then considers all of the proven aggravating and

[9] Petitioner also urges the merits of the button issue, separate from his ineffectiveness claim. (Doc. 30 at 223.) However, that issue was raised and decided on appeal. *Mitchell*, 502 F.3d at 971-72. A court may entertain a successive claim in a § 2255 petition if the law has changed or if necessary to serve the ends of justice. *Polizzi v. United States*, 550 F.2d 1133, 1135-36 (9th Cir. 1976). Because Petitioner has not demonstrated that his new arguments are based on a change in the law or that a manifest injustice will occur if the claim is not considered, this Court declines to reconsider the issue.

mitigating factors, including any non-statutory aggravators, to determine propriety of a death sentence ("selection decision"). 18 U.S.C. § 3593(e).

Petitioner contends that counsel were ineffective for not seeking to separate the eligibility and selection decisions within the penalty phase, "thus subjecting Mitchell to an overly prejudicial sentencing hearing" because the prosecution offered highly emotional testimony from the victims' family to prove a non-statutory aggravating factor that was relevant only to the selection decision, not the death eligibility decision. (Doc. 30 at 230.) He further asserts that the jury found him eligible for the death penalty based on inadmissible, inflammatory victim impact evidence. (*Id.* at 236-37.)

No court has held that the federal constitution requires that the eligibility and selection decisions be made in separate hearings. *See United States v. Fell*, 531 F.3d 197, 240 (2d Cir. 2008) (holding that Federal Death Penalty Act not unconstitutional because it fails to require separate hearings for eligibility and selection decisions); *see also United States v. Bolden*, 545 F.3d 609, 618-19 (8th Cir. 2008) (citing *Fell* with approval). Thus, counsel's decision not to seek trifurcation of the jury's determinations as to guilt, capital eligibility, and sentence was within the wide range of reasonable professional assistance guaranteed by the Sixth Amendment.

Moreover, Petitioner cannot establish prejudice because there is no reasonable probability the jury would have reached a different verdict as to his eligibility for capital punishment had counsel successfully moved the Court to hold separate hearings for the eligibility and selection decisions. With respect to Slim's death, the Government alleged five statutory aggravating factors: that she was killed for pecuniary gain and in an especially heinous, cruel, or depraved manner; that substantial planning and premeditation preceded the offense; that the victim was vulnerable due to age or infirmity; and that more than one person was killed in a single criminal episode. *See* 18 U.S.C. §§ 3592(c)(6), (8), (9), (11) & (16). The Government noticed these same factors with regard to the child's death and also alleged that she was killed during the commission of a kidnapping. *See* 18 U.S.C. § 3592(c)(1). The jury unanimously found the existence of each alleged aggravating factor as well as all four

of the gateway intent factors set forth in 18 U.S.C. § 3591. (CR Docs. 330, 331.) These findings are easily supported by the evidence presented at trial, as well as the jury's guilty verdicts on premeditated first degree murder, kidnapping, and robbery. There is simply no question that the jury would have found at least one requisite mental state and one statutory aggravating factor even had it not heard testimony from the victims' family members.

### I. Cumulative Effect (Claim BB)

Petitioner asserts that is entitled to relief based on the cumulative effect of counsel's alleged ineffectiveness. As already discussed, Petitioner has not established that defense counsel's representation was deficient with respect to any individual allegation of ineffectiveness. Accordingly, there can be no cumulative prejudicial effect from the alleged deficiencies. *See United States v. Baldwin*, 987 F.2d 1432, 1439 (9th Cir. 1993) (finding no cumulative prejudice where defendant failed to establish individual ineffectiveness claims).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

The right to effective assistance of counsel applies not just to the guilt phase but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Strickland*, 466 U.S. at 689-90. The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687).

### A. Mitigation Evidence (Claims B & D)

Petitioner argues that counsel were ineffective for not investigating and presenting his social history, including his drug and alcohol abuse, as a mitigating circumstance. He asserts that his "troubled, dysfunctional upbringing provided a compelling story for why he turned to drugs and alcohol so early in life" and that counsel failed to consult and present testimony

from "appropriate and necessary" experts concerning his executive functioning deficits, substance abuse, upbringing, and family background. (Doc. 30 at 91, 112.) He further contends that counsel did not give their experts adequate background information or properly prepare the penalty phase witnesses to testify. Finally, he argues that evidence of intoxication at the time of the offense would have established the "impaired capacity" statutory mitigating factor under 18 U.S.C. § 3592(a)(1).

1. <u>Relevant Facts</u>

The penalty phase began on May 14, 2003, six days after the jury returned its guilty verdict. Over the course of two days, the parties proffered witnesses and exhibits relevant to sentencing. The Government relied on the evidence presented at trial to establish the gateway intent factors in 18 U.S.C. § 3591, as well as the alleged statutory aggravating factors. To establish harm to the victims' family as a non-statutory aggravating factor, the Government called four family members, who described the impact of the murders, including the loss of Slim as the family's matriarchal teacher of Navajo heritage, traditions, and practices. (RT 5/14/03 at 3754-81.)

As discussed more fully below in Section II.B, Petitioner refused to attend the evidentiary portion of the penalty phase and did not testify. However, the defense submitted as exhibits numerous photographs of Petitioner; documents related to other crimes committed by Orsinger and Nakai; Kinlicheenie's plea agreement; and a letter written by the Attorney General of the Navajo Nation to the United States Attorney indicating opposition to capital punishment, both generally and in Petitioner's case. The defense also called a number of Petitioner's family members, friends, and teachers, and played a videotaped interview of his maternal grandmother, who was too ill to appear in person.

Dr. Robert Roessel testified that he was the executive director of Petitioner's Navajo community high school and frequently interacted with him. (RT 5/14/03 at 3795.) Petitioner, who was only one quarter Navajo, was respectful and had no disciplinary problems except for a brief suspension in his senior year after being caught with marijuana. Dr. Roessel described Petitioner as an excellent student and outstanding athlete, who played

football, was active on the student council, and spoke at his high school graduation in 2000. However, the next year Petitioner broke into Roessel's office, stole a computer and shotgun, and used the latter to rob a store.

Dr. Roessel knew Petitioner's family well and believed Petitioner was unloved. According to Dr. Roessel, Petitioner never knew his father and his mother was never around. Petitioner's difficulties were compounded because he was not full-blooded Navajo and had failed to accept the teachings of the Navajo culture. Although Petitioner's mother was an educator, she never participated in any student-parent meetings at the school or spoke with any of Petitioner's teachers. Petitioner lived primarily with his maternal grandparents, who were also teachers and school administrators. At some point his grandmother, Bobbi Mitchell, moved to California and left him with his Navajo grandfather, George Mitchell; Petitioner was unhappy, moved in with friends, and "began to go downhill." (*Id.* at 3804-05.) Despite the instant crimes, Dr. Roessel testified that Petitioner's life was worth sparing because he had good potential and could possibly teach others while in prison.

Dr. Roessel's wife, Ruth, also worked at Petitioner's high school, saw him regularly, and knew his family. She explained that grandparents are extremely important in Navajo families for teaching customs and traditions, but that Petitioner's grandfather was a "cold" person. (*Id.* at 3825-28.)

Auska Mitchell, Petitioner's uncle, testified that Petitioner got along well with his wife and children and were loved by them. Along with George and Bobbi Mitchell, Auska and his family went to Petitioner's graduation to hear his speech; Petitioner's mother did not attend. (*Id.* at 3892-93.) Petitioner was always respectful except for one time when Auska found a marijuana pipe in Petitioner's bag. After being confronted, Petitioner cried, apologized, and participated in a cleansing ceremony. Auska testified that Petitioner's life should be spared because he had been a good person until he met Johnny Orsinger, was a fast learner, and had vocational and computer skills he could pass on. (*Id.* at 3896.)

Petitioner's high school coach testified that Petitioner was an excellent player, was a team leader, got along well with others, never had any outbursts, and had an opportunity

to play football in college. (*Id.* at 3904-07.) John Fontes, the assistant principal at Petitioner's high school, recalled that Petitioner was initially withdrawn when he transferred from another high school but over time became an excellent student who became involved with both football and student government. (*Id.* at 3912.) He remarked that Petitioner improved dramatically on standardized tests, jumping from tenth grade level to post-high school within six months. Petitioner was never involved in any confrontations with teachers or other students, had good relationships with other members of the faculty, and helped build a courtyard at the school. Fontes never met Petitioner's mother. The one time he tried to reach her – concerning his marijuana suspension – she had someone contact Fontes's supervisor with the directive that Fontes was to make no further attempts to contact her because "she wanted nothing to do with Lezmond Mitchell." (*Id.* at 3917.) In Fontes's view, Petitioner's life was worth sparing because he had demonstrated the potential to learn, would work well in a structured environment, had the ability to teach and lead others in a positive way, was an excellent reader and writer, and was good in other vocational areas. (*Id.* at 3919-22.) This viewpoint was echoed by Petitioner's English teacher, who also described Petitioner as an excellent reader and writer. She testified that Petitioner was very bright, thoughtful, and hungry for knowledge, and that he helped her teach students of low reading ability. (*Id.* at 3938-45.) She also characterized him as a "gentle" person who would "disengage" rather than become violent or angry in any confrontation. (*Id.* at 3940.)

Shortly after turning 18, Petitioner moved in with the family of an old friend, Lorenzo Reed. Reed testified that Petitioner's mother had essentially abandoned him and that this was a source of pain for Petitioner. (*Id.* at 3929-30.) Petitioner helped out around the house and was respectful to Reed's grandmother, Betty Goldtooth, who was the head of the household. A couple of months after his graduation, Petitioner moved into Reed's uncle's home in Phoenix. He worked odd jobs for a short time and then went to California to live with his maternal grandmother. During this period, he encouraged Reed to finish high school and then returned to the reservation to attend Reed's graduation in 2001. (*Id.* at 3934.) Another member of the Goldtooth household testified that Petitioner was trusted and often left alone

in the house, that he had become a member of their family, and that she visited him regularly while he was in jail pending trial. (*Id.* at 3953-54.)

FBI Agent Raymond Duncan also testified during the penalty phase. (*Id.* at 3957-3998.) Defense counsel elicited details about Johnny Orsinger and Gregory Nakai being convicted of the murder, kidnapping, and carjacking of two men on the reservation two months before the Slim carjacking. Orsinger shot one in the head and Nakai shot the other; Petitioner was not involved. In addition, Duncan confirmed that Kinlicheenie never told investigators that Petitioner went to Gallup armed or with the intent to commit a carjacking, that Orsinger had bragged to Kinlicheenie about being a killer, and that Orsinger's young age precluded the death penalty for his role in the instant offenses. Duncan also testified that Petitioner had claimed to be so drunk on the day of the murders that he had passed out at some point and was unsure where Slim had picked them up. However, on cross-examination, he revealed that Petitioner was able to lead investigators to the bodies. Duncan further testified that, although Petitioner claimed he had drunk two 40-ounce bottles of beer and later bought additional liquor in Gallup, alcohol was not sold in Gallup on Sundays and the carjacking took place on a Sunday.

John Sears gave the closing argument for the defense. He acknowledged the brutality of the crimes but asserted that "sometimes seemingly good people can do terrible things, can be in a situation that produces a terrible result." (RT 5/16/03 at 4136.) Sears focused heavily on fairness and proportionality, arguing that neither Orsinger nor Nakai faced the death penalty for their crimes and that Orsinger had killed four people and was more culpable than Petitioner. He stressed the similarities between the two double homicides – carjacking, murder, mutilation of the victims' bodies, and destruction of evidence. He also argued that it was Orsinger who instigated the offenses against Slim and her granddaughter, citing evidence at trial suggesting Orsinger inflicted the majority of the stab wounds against Slim and dropped the first rock on the child. In addition, Sears asserted that Petitioner had been drinking and was so drunk he could not remember where everything happened.

Sears also stressed Petitioner's circumstances, including the fact that he was only 21

years old and would spend the rest of his natural life in a prison cell, something he argued could be seen as a sentence worse than death. He reemphasized that Petitioner had no criminal record, that he had been a good student and leader, and that good people sometimes do bad things. He said that something had happened to Petitioner and suggested it was a confluence of growing up without a father, being rejected by his mother, being raised by a grandmother who was concerned only about herself,[10] being of mixed race and not knowing who he was or how to fit into Navajo culture, being adrift after high school graduation, and hanging around Johnny Orsinger, who had already participated in two murders and was clearly a disturbed teenager.

Sears proposed that Petitioner could have a positive effect on others, even if just by serving as a negative role model. He read from the Navajo Nation's letter asking the United States Attorney not to seek the death penalty against Petitioner, emphasizing that Navajo culture values life and instructs against the taking of life for vengeance. Finally, he pleaded for mercy.

After deliberating for one-and-a-half days, the jury returned its sentencing verdicts. For each victim, the jury unanimously found all four gateway intent factors as well as each of the statutory and non-statutory aggravating factors alleged by the Government. (CR Docs. 330 & 331.) In mitigation, the jury unanimously found that Petitioner did not have a significant prior criminal record; that an equally-culpable co-defendant would not be

---

[10] Bobbi Mitchell's videotaped statement was not transcribed into the record, but during closing argument counsel summarized it as follows:

> And you saw his grandmother. I'm sorry, but I listened to her. She was my witness. But she spoke for 29 minutes without talking about Lezmond. She talked about herself. And at the end she talked about Lezmond. I know that undercuts the value of what she says, but for God's sake, that's powerful information about what happened to Lezmond. His grandmother who raised him is asked to give a statement to a jury that's concerning whether he should die and she wants to talk about her own resume.

(RT 5/16/03 at 4156.)

punished by death; and that Petitioner would be sentenced to life in prison without any possibility of release if not sentenced to death. (CR Doc. 330 at 6-7; CR Doc. 331 at 5-6.) In addition, seven jurors concluded that the Navajo Nation letter constituted a mitigating factor, six found that Petitioner's background mitigated against death, two decided that Petitioner would adapt well to prison life if he were sentenced to life without the possibility of release, and one found that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired. (*Id.*) After weighing the aggravating and mitigating factors, the jury unanimously recommended the death penalty as punishment for the murders of both Alyce Slim and her granddaughter.

2. Scope of Investigation

Petitioner argues that counsel failed to adequately investigate his family background, history of abuse and neglect, brain dysfunction, drug and alcohol addiction, and intoxication at the time of the offense. The Court disagrees and finds that counsel conducted a reasonable mitigation investigation.

In his deposition, defense counsel Williams stated that "it seemed pretty clear from the outset that this [case] was going to be getting to the penalty phase" and that they needed to do everything they could to find some way of explaining Petitioner's behavior. (Doc. 49, Ex. 1 at 27, 29.) Bartolomei said that over the course of the representation, Bartolomei established a relationship with Petitioner and took the lead on the mitigation investigation. "I saw him a lot, met with him a lot, and basically spent time with him." (Doc. 49, Ex. 2 at 8.) They spoke in great detail on topics such as Petitioner's childhood, interests, mother, grandparents, medical history, and schooling; counsel learned that Petitioner had anger issues towards his mother and problems relating to his grandfather. (*Id.* at 13-16.)

Counsel also enlisted the aid of an experienced mitigation specialist, Vera Ockenfels, who was referred by the Arizona Federal Public Defender's Capital Habeas Unit. (*Id.* at 14.) Ockenfels gathered all available records and traveled with Bartolomei to the Navajo reservation to interview Petitioner's mother, grandparents, uncle, football coach, teachers,

and friends.[11] (*Id.* at 14, 17-20, 58-59; Doc. 49, Ex. 3 at 37-38.) Ockenfels also interviewed additional family members, school employees, and acquaintances. Petitioner's mother, Sherry Mitchell, was disagreeable and at some point refused to cooperate. According to Bartolomei, she "just started rambling and talking about herself and being embarrassed herself and how this affected her life and things like that." (Doc. 49, Ex. 2 at 17.) He further noted that she had spoken to the FBI after Petitioner's arrest and made some "unhelpful" comments about him. (*Id.*) Counsel Williams also met separately with Sherry, but she had an attitude, seemed more concerned about herself, and walked out of the interview. (Doc. 49, Ex. 1 at 27-28.) Counsel also tried to locate Petitioner's father, who was a native of the Marshall Islands, but he had died just weeks before their investigator went there to find him.[12] (Doc. 49, Ex. 2 at 24.)

Ockenfels prepared a detailed, 42-page social history of Petitioner. (Doc. 43, Ex. 93.) In these proceedings, Petitioner asserts in a conclusory fashion that the report is "sufficient in some areas, incomplete in others, but overall is inadequate." (Doc. 30 at 66, 109.) However, he does not specify any of the alleged inadequacies. In addition, Petitioner has proffered a 55-page declaration from a social worker retained by habeas counsel to identify social history information, but, other than providing some additional anecdotal detail, her report does not differ appreciably from Ockenfels's narrative. (Doc. 30-3, Ex. 143.) Both documents provide biographical background on Sherry Mitchell and her parents, George and Bobbi Mitchell. Both observe that Sherry and Bobbi were frequently embroiled in personal jealousies and arguments, were each emotionally and physically abusive, and were concerned more for their careers than for Petitioner. Both note that George and Bobbi argued frequently

---

[11] Petitioner does not allege that counsel neglected to gather important, relevant life history records and concedes that "[a]ll of Mitchell's school records were in trial counsel's files." (Doc. 30 at 32.)

[12] Petitioner complains that counsel failed to develop the paternal side of his family but does not clearly identify any significant information that was not already known to counsel. He acknowledges that counsel and their investigator gathered records about his father and interviewed his father's widow and brother. (Doc. 30 at 23.)

and lived apart more often than not, and that Petitioner never knew his father, was essentially abandoned by his mother, was frequently shuffled between towns and schools, and was primarily raised in an isolated part of the Navajo reservation by George, who was 60 years older and emotionally distant. Both also state that Petitioner struggled with identity and self-confidence issues, due in part to his mixed race, his large size, and his lack of fluency in the Navajo language and culture. Finally, both note that Petitioner likely turned to drugs and alcohol as a result of abandonment and the lack of a stable, nurturing home.

In her report, Ockenfels also documented behavioral problems that began at an early age, likely as a result of the "emotional turmoil [Petitioner] suffered at home." (Doc. 43, Ex. 93 at 20.) These included being defiant and headstrong, yelling and cussing at teachers, and being unruly in the classroom. By the seventh grade, Petitioner fought frequently with other students and in tenth grade was suspended for throwing a chunk of plasterboard at a teacher. Soon after starting eleventh grade, he lost control during a fight and knocked over a security guard while trying to get to his opponent. In lieu of expulsion, he transferred schools and underwent counseling. According to Ockenfels's investigation, starting in the third grade Petitioner had turned to gangs to fulfill his need for a family and by the eighth grade had formed his own, the East Side Thugs. (*Id.* at 35-37.) Ockenfels further noted that Petitioner experienced mounting anger through the years, which he sometimes took out on animals by, for example, flinging dogs by their tails off of bridges and shooting dogs and cats "purely for its entertainment value." (*Id.* at 24-25.)

It is evident from this record that counsel conducted an adequate investigation of Petitioner's family background and history of abuse and neglect. Although Petitioner argues otherwise, he also acknowledges in his motion that the "facts and witnesses concerning Mitchell's poor school performance and the abuse and neglect he suffered was readily available to trial counsel – most, if not all, was provided to them by their own mitigation investigator well before trial." (Doc. 30 at 36.) Petitioner also asserts that if counsel had not alienated Sherry Mitchell and had investigated Bobbi Mitchell "thoroughly," they would have discovered that Bobbi was mentally ill. (Doc. 30 at 120.) However, he fails to provide

any evidence that Bobbi was ever diagnosed with a mental disease or defect and it appears this assertion is based purely on speculation. Such unsupported allegations are insufficient to establish ineffective assistance of counsel.[13]

In addition to undertaking an extensive social history investigation, counsel investigated Petitioner's mental health and state of mind at the time of the offense. They first had him examined by a psychologist, Dr. Susan Parrish. She did not prepare a report but, according to Williams, concluded that Petitioner was sociopathic and advised counsel not to call her as a witness. (Doc. 49, Ex. 1 at 16-17.) Petitioner then underwent extensive testing and examination by a team of experts at the University of Arizona, including a psychiatrist, a neuropsychologist, and a neurologist. The neurological exams, EEG, MRI, and laboratory results were all normal. (Doc. 43, Ex. 94 at 18.) Neuropsychological testing revealed "some mild deficits in executive functioning (impulsiveness and poor planning)" that "were more likely related to emotional factors rather than traumatic brain injury." (*Id.*) The neuropsychologist also determined that Petitioner was of average general intelligence. (Doc. 35-1 at 1.)

Dr. Barry Morenz diagnosed Petitioner as suffering from a depressive disorder, not otherwise specified (because Petitioner "at times feels despondent and hopeless"); polysubstance abuse in a controlled environment (based on Petitioner's abuse of "alcohol, marijuana, cocaine, Ecstasy and other drugs on a regular basis for a number of years"); a cognitive disorder not otherwise specified (deemed "provisional" because Petitioner's executive functioning deficits "were mild and of uncertain etiology and clinical significance"); and an antisocial personality disorder. (Doc. 43, Ex. 94 at 17-18.) With regard to the latter, the psychiatrist noted that Petitioner had

---

[13] Even if Petitioner could establish that Bobbi Mitchell suffered from a mental illness and that this information was readily available to counsel, the Court concludes that such evidence likely would have had no impact on defense counsel's sentencing strategy. As discussed below in Section II.A.3, counsel sought to portray Petitioner's positive attributes, including coming from a family of educators and educated people, and believed emphasis on his family's negative characteristics would have undermined this goal.

> a history beginning in childhood of aggression, deceitfulness, frequent rule violation and cruelty to animals such that he would have warranted a conduct disorder diagnosis as an adolescent. Since he has turned 18 this pattern has continued. He has been deceitful, impulsive, aggressive and irresponsible. He has disregarded the rights of others. He also shows little remorse for his behaviors. These factors indicate he warrants the diagnosis of an antisocial personality disorder.

(*Id.* at 18.)

Counsel also obtained Petitioner's only available pre-offense psychological records. Intelligence testing conducted when Petitioner was seven indicated that he had a full scale IQ of 107 and his reading recognition, spelling, and arithmetic tested at the 2.5 grade level. No further testing took place until Petitioner was 17, when he underwent counseling with Dr. Edward Fields after his near expulsion from high school for fighting. Dr. Fields administered an MMPI test and reported that

> [t]he preliminary results are consistent with his reported problems. Overall they describe a very troubled young man. Intensive psychotherapy is in order. It can be done on an out patient basis if he will cooperate and attend scheduled appointments. Failing that, a residential placement may be necessary. He could be in serious jeopardy otherwise. The risk is anti-social behavior that could produce serious law encounters.

(Doc. 43, Ex. 93 at 26.)

Petitioner asserts summarily that counsel "failed to consult with appropriate and necessary experts" and, for those they did consult, failed to "give them adequate background information about Mitchell." (Doc. 130 at 112, 114.) In support he proffers a declaration from a newly-retained expert, Dr. Pablo Stewart, who opines that Petitioner suffers from Posttraumatic Stress Disorder (PTSD) based on the "violence and abuse" he suffered and witnessed as child, as well as Substance Dependence. (Doc. 30-2, Ex. 135 at 31-33.) Dr. Stewart further opines that, as a result of Petitioner's drug and alcohol abuse in the period preceding the crime, he suffered a Substance-Induced Psychotic Disorder (SIPD) at the time of the offense. (*Id.* at 43.) He concludes that he or a similar mental health professional could have testified that Petitioner's severe intoxication, SIPD, and PTSD "synergized with each other resulting in the alteration of Mr. Mitchell's cognitive and behavioral functioning, which severely impaired his ability to premeditate or intend to commit murder." (*Id.* at 53.)

The Court accords little value to Dr. Stewart's report because it focuses on what "defense counsel could have presented, rather than upon whether counsel's actions were reasonable." *Babbitt*, 151 F.3d at 1174. Nothing in Dr. Stewart's declaration supports Petitioner's assertion that counsel failed to consult with appropriate experts. *Cf. Frierson v. Woodford*, 463 F.3d 982, 991-92 (9th Cir. 2006) (finding counsel ineffective for relying only on psychiatrist and not consulting with neurologist where defendant had history of multiple head trauma and medical records referenced organic brain dysfunction); *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) (finding counsel ineffective for relying on psychiatrist and psychologist and not consulting with expert in neurology or toxicology after learning defendant had been exposed to high levels of toxic chemicals and pesticides). Nor does Dr. Stewart suggest that the experts who evaluated Petitioner before trial were unqualified to assess his mental state at the time of the offense. *See Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the wide range of professionally competent assistance for an attorney to rely on properly selected experts.") (internal quotation omitted). Also, Petitioner does not allege that any of the experts with whom the defense consulted suggested that additional testing or consultation with other types of experts would be helpful. *See Babbitt*, 151 F.3d at 1174 ("The experts [counsel] had retained did not state that they required the services of these additional experts. There was no need for counsel to seek them out independently.").

Petitioner baldly asserts that "the mental health professionals to whom counsel provided *some* information were given *nothing* regarding Mitchell's life history." (Doc. 30 at 67.) However, he proffers no evidence to substantiate this allegation. Nor does he assert that any of the experts actually requested additional social history information. *See Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) (holding that counsel does not have a duty to gather background information for an expert in the absence of a specific request to do so). In his report, Dr. Morenz states that he interviewed Petitioner twice for a total of six hours and spoke with the defense investigator for one hour and with Ockenfels for one-and-a-half hours "to review the information they had obtained about Mr. Mitchell."

(Doc. 43, Ex. 94 at 2.) In addition, his report provides a detailed narrative of Petitioner's developmental and educational history, including the fact that Petitioner never knew his father, that Bobbi was reared in a violent and chaotic household, that George and Bobbi lived more apart than together, that there was considerable conflict with some physical abuse between Sherry and Bobbi, that there was little warmth in the Mitchell family and individual members were physically and emotionally isolated, that Sherry was unaffectionate and whipped Petitioner, that George and Bobbi also whipped him and frequently fought, and that Petitioner is not fluent in Navajo and received little education about Navajo culture. There is simply no support for Petitioner's assertion that the experts with whom counsel consulted lacked sufficient background information to effectively render an opinion concerning his mental health.

Petitioner also asserts that counsel failed to adequately investigate his increased drug and alcohol consumption in the months preceding the crime. He argues that there were numerous witnesses "who could have directly or indirectly corroborated Mitchell's statement to the case agent that he was drunk." (Doc. 30 at 94.) Petitioner has proffered declarations from the Nakai brothers and Padrian George who assert that everyone staying at the Nakai house between August and October 2001 drank excessively and used a lot of drugs, including cocaine, Ecstasy, and methamphetamine. (Doc. 12, Exs. 100 &107; Doc. 30-2, Exs. 136 & 137.) A declaration from Orsinger states that by the time he and Petitioner got to Gallup, they "had been awake for several days drinking beer and using drugs." (Doc. 12, Ex. 109 at 3.) Petitioner has not offered his own declaration but apparently told Dr. Stewart during a 2009 evaluation that

> he had not slept for the three nights previous, and that he drank malt liquor and smoked a variety of drugs two nights before to the point of intoxication. He remembers using methamphetamine, both snorting it and smoking it, during the week before October 28, increasing in its use before going to Gallup. He also ingested Ecstasy and smoked crack cocaine and marijuana rolled together into P-dog cigarettes. Lezmond recalls that he and Orsinger made it to Gallup on Saturday morning, October 27, and left that afternoon, and returned to the Nakia's [sic] on Monday morning, October 29.
>
> Lezmond continued smoking crack cocaine and marijuana, as well as drinking for a few days following October 28, and using other drugs until his

arrest on November 4, 2001.

(Doc. 30-2, Ex. 135 at 24-25.) Petitioner has also obtained a declaration from Dr. Morenz, who states that, if the declarations from individuals who saw Petitioner use alcohol and drugs before the offense are "[t]aken as true," knowledge of Petitioner's "substance and alcohol use in the months and days preceding the capital offenses in late October 2001, *could* have made a significant difference" in that he "would have developed further with Mr. Mitchell that he *may* have been under the influence of major, strong, and powerful illicit drugs at the time of the offenses . . . and his perceptions of reality *might* have been altered." (Doc. 30-3, Ex. 144 (emphasis added).) This evidence, Petitioner contends, would have established as a mitigating factor under 18 U.S.C. § 3592(a)(1) that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law's requirements was significantly impaired.

As set forth in Section I.B above, Petitioner adamantly and repeatedly denied to his attorneys that he was under the influence of either drugs or alcohol at the time of the killings. He also told Ockenfels that he last used cocaine in July 2001 and crystal methamphetamine in September 2001, the month before the offense. (Doc. 43, Ex. 93 at 33.) Dr. Morenz reviewed the FBI reports and was on notice of Petitioner's statements about being intoxicated and blacking out during the offense. (Doc.43, Ex. 94 at 2.) He was also aware of Petitioner's drug and alcohol problems, having diagnosed Petitioner with polysubstance abuse. Petitioner has not alleged that Dr. Morenz failed to inquire whether he was under the influence of intoxicants at the time of the offense. Given the available information, it is reasonable to conclude Dr. Morenz would have explored this topic during his lengthy meetings with Petitioner. Additionally, Petitioner provided him the following detailed statement about the offense:

> Mr. Mitchell states that they had been "shooting the breeze" about robbing the trading post for 1-2 months before they actually committed the robbery. Mr. Mitchell acknowledges that he and Johnny went to steal a truck so they could move the safe of the trading post if they couldn't open it during the robbery. . . . Mr. Mitchell states that he had wanted to steal an unoccupied truck, not carjack one where they would have to confront a driver and possibly passengers.

> Mr. Mitchell states they were given a ride by the victims. Mr. Mitchell states that when the victims stopped to let Mr. Mitchell and Johnny out of the vehicle, he started to get out of the vehicle and then Johnny started cutting up the driver. Mr. Mitchell wasn't sure what to do but he decided to get back in the truck and he stated, "I was going to be a good soldier and help him out." Mr. Mitchell put his hand over the little girl's mouth so she wouldn't yell. Mr. Mitchell stated, "The old lady died. Johnny put her in the back seat." Mr. Mitchell lifted the little girl into the back seat and then he got in the front. Mr. Mitchell states that Johnny drove for a while but his driving was erratic, so Mr. Mitchell took over. Mr. Mitchell states that it took a couple of hours to get to the location where the girl was killed. Mr. Mitchell commented that Gregory Nakai told them "no more dead bodies," referring to the cowboys that they had apparently killed some time before (Mr. Mitchell was not involved but knew about the killings). Mr. Mitchell states that Johnny wanted him to kill the girl and he refused. Mr. Mitchell states that Johnny cut the girl up but she didn't die. Mr. Mitchell states that Johnny wanted him to help him find a big rock to hit the girl with and kill her. A bigger rock was located and Johnny hit the girl three times with it. Mr. Mitchell thinks she was probably already dead when Johnny hit her with the larger rock. Mr. Mitchell states that he never did anything violent directly to either of the victims. Mr. Mitchell states that he threw the rock Johnny used to hit the girl in order to hide it. They left the corpses covered in some leaves.
>
> Cleaning fluids were in the car, so Mr. Mitchell and Johnny cleaned out the car the best they could but there was still a lot of blood on the seats, in the vents and on the ceiling. They couldn't completely clean the truck of all the blood. They burned some of the victim's belongings and then they stashed the truck near Mr. Mitchell's grandfather's house and went to Gregory Nakai's house.
>
> The next day, Gregory told them to go back up and cut off the heads and the hands of the victims so they couldn't be identified. When they returned to where they left the corpses, they took off the clothes of the victims (with the exception of the underwear) and burned them. They buried the heads and the hands but not the bodies. They believed that the bobcats would get the bodies soon enough. They went back to Gregory Nakai's house and burned their own clothing from the day before. Four days later Mr. Mitchell, Johnny and others committed robbery of a nearby trading post and were arrested.
>
> Mr. Mitchell states that Gregory Nakai didn't want to do the robbery, he felt that he was already getting enough heat about the cowboys they had killed. Mr. Mitchell states that he believed they could do the robbery without any difficulty but he had not planned on killing anyone, he just wanted to steal a truck but not do a carjacking. Mr. Mitchell states, "Other than that, everything went smooth." I asked Mr. Mitchell how he felt about the victims. Mr. Mitchell replied, "Kind of fucked up because of the old lady and the little girl...that fucking shit disgusts me but it couldn't have been avoided. I'm running this equation in my head that 9 times out of 10 if we let that little girl go the cops will be after us."

(Doc. 43, Ex. 93 at 6-7.) Given this admission, which exhibits Petitioner's rational consideration about destroying evidence and killing the child to avoid apprehension, it is highly unlikely that providing Dr. Morenz with evidence of Petitioner's increased drug and

alcohol use in the weeks or even days before the murder would have led to his opining that Petitioner was unable to appreciate the consequences of his actions or to control his conduct. Indeed, the declaration Dr. Morenz prepared for these proceedings is highly equivocal, stating only that Petitioner's perception of reality "might" have been altered by intoxicants. *See West v. Ryan*, 608 F.3d 477, 487 n.10 (9th Cir. 2010) (postconviction letter from expert asserting that he "may have" diagnosed defendant with PTSD had counsel provided additional social history insufficient to establish deficient performance).

Moreover, none of the declarations of individuals living at the Nakai house provide any specific information about any substances Petitioner consumed on the day of or before the offense; instead, they contain only general statements that the use of drugs and alcohol increased after August 2001. *See Williams*, 384 F.3d at 615-16 (noting weakness of lay testimony that failed to provide any facts suggesting the defendant's drug use had the specific effect of diminishing his mental capacity at or near the times of the crimes). The only other participant in the carjacking and murders, Johnny Orsinger, now claims that he and Petitioner had been using drugs, but he too neglects to identify any specifics about the type or quantity. Further, at the time of Petitioner's trial, Orsinger refused to testify and was not an available witness. Petitioner also "insisted [to his attorneys] that he was sober and straight," and Bartolomei observed that Petitioner and Orsinger were

> given a ride by a trooper, some sort of police officer, as they were hitchhiking. They spent the day at the mall. They bought, you know, whatever they bought, knives and what have you. And then they got a ride from a Hispanic, Mexican fellow. And the fact that he was given a ride by Ms. Slym [sic], [I] don't know that it makes sense that she would give a ride to two people who were whacked out.

(Doc. 49, Ex. 2 at 38-39.) Petitioner's own detailed recollection of the crime (including his recitation to Dr. Morenz), the multi-hour duration of the ordeal, the extended drive to a remote area, and his ability to lead investigators back to the crime scene severely undercut the argument that he was too intoxicated to understand the nature of his actions or to control his conduct. In light of the information available to counsel, including Petitioner's insistence that he was not intoxicated, the Court concludes that the scope of their investigation into

Petitioner's alleged intoxication at the time of the crime was reasonable.

In sum, the Court finds that counsel undertook a thorough investigation for potential mitigating evidence. While additional interviews of family and friends can always be conducted, Petitioner has not established that such efforts would have uncovered significant information about Petitioner's life history that was not already known to counsel. *See Bobby v. Van Hook*, 130 S. Ct. 13, 19 (2009) ("[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative."). In addition, counsel enlisted appropriate experts and conducted a reasonable investigation concerning Petitioner's state of mind and possible intoxication at the time of the offense. Accordingly, the Court concludes that this

> is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, *cf. Wiggins [v. Smith*, 539 U.S. 510, 525 (2003)], or would have been apparent from documents any reasonable attorney would have obtained, *cf. Rompilla v. Beard*, 545 U.S. 374, 389-93 (2005). It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments." 466 U.S. at 699.

*Id.*

3. <u>Mitigation Presentation</u>

Petitioner also argues that counsel were ineffective for not presenting to the jury all of the evidence they had collected. Specifically, he asserts that counsel should have called lay and expert witnesses to testify concerning his intoxication at the time of the offense. He further contends that counsel should have utilized a social historian to discuss his life history and enlisted mental health experts to explain his executive functioning deficits, substance abuse, and addictions. Finally, he argues that the witnesses who did testify at the penalty hearing were unprepared and provided only a vague portrait of his childhood.

In their depositions, counsel explained that, in the absence of credible evidence to explain Petitioner's conduct (e.g., mental illness), they chose to focus on Petitioner's positive traits to demonstrate that "there was some value to his life and some reason why he should be spared." (Doc. 49, Ex. 1 at 53; *see also* Doc. 49, Ex. 2 at 54; Doc. 49, Ex. 3 at 31.)

Counsel Sears testified that in his experience, in a post-9/11 atmosphere, focusing on a defendant's background as a means of explaining terrible conduct could be viewed negatively by a jury. (Doc. 49, Ex. 3 at 35.) Thus, defense counsel wanted to stress Petitioner's potential and hoped at least one juror would be swayed by the fact that Orsinger did not face the death penalty yet was more culpable, that Petitioner was treated poorly by his mother and was caught between different cultures, and that life without the possibility of parole in prison would not be a "cake walk." (Doc. 49, Ex. 1 at 53; Doc. 49, Ex. 3 at 30-33.)

Counsel have substantial leeway in making strategic and tactical decisions about how to present a case at a capital sentencing hearing and are not required to present every conceivable mitigation defense if, after proper investigation and review, they conclude that it is not in the defendant's best interest to do so. *Darden v. Wainwright*, 477 U.S. 168 (1986). As explained below, the Court finds that the above-described investigation was sufficient to support counsel's reasonable strategic decision not to present evidence regarding Petitioner's family and life history, drug and alcohol dependence, executive functioning deficits, and state of mind at the time of the offense because (1) the evidence was not particularly helpful, (2) presentation of the evidence would have opened the door to damaging rebuttal testimony, and (3) lingering doubt concerning Petitioner's role in the offense and emphasis of his positive attributes were viable defenses. *Cf. Williams*, 384 F.3d at 615-16.

*Minimal Mitigation Value*

Much of the evidence Petitioner now argues should have been presented offered only weak mitigation and would have detracted from counsel's goal of portraying Petitioner as someone with good qualities, who had the potential to be a leader in prison. (Doc. 49, Ex. 2 at 53-54.) For example, counsel had significant evidence of Bobbi and Sherry Mitchell's history of personal problems and abuse. Although an argument could be made that being raised by such dysfunctional individuals rendered Petitioner less blameworthy, counsel believed that focusing on their negative characteristics worked against the defense position that Petitioner came from a family of educators and educated people and thus had positive

traits. (*Id.* at 80.) Similarly, although Dr. Morenz's report documented Petitioner's chaotic upbringing and drug and alcohol abuse, it also revealed that Petitioner had a history of aggression and cruelty to animals. Counsel did not want the jury to learn of Petitioner's anger and antisocial traits because "the facts in this case already instill fear in people," and they did not want to present anything that made Petitioner "look like someone the jury should be afraid of." (*Id.* at 78-79.) The Court concludes that counsel made a reasonable strategic decision to keep potentially damaging facts about Petitioner's upbringing from the jury. *See Williams*, 384 F.3d at 616.

The Court also finds reasonable counsel's conclusion that a diminished capacity defense based on Petitioner's drug and alcohol abuse was not viable. First, there was little evidentiary support for such a defense. Petitioner adamantly denied being intoxicated at the time of the killings. Nothing in Orsinger's statement to investigators indicated that he and Petitioner had been under the influence of an intoxicant. Although Orsinger now claims in a post-conviction declaration that they had not slept for days and were using a lot of drugs, he refused to testify and was not an available witness. The Nakai brothers and Padrian George claim that drinking and drug use at the Nakai home escalated in the months preceding the offense. However, even assuming these witnesses were available to testify, none could have established that Petitioner's thoughts or actions on the day of the carjacking were materially affected by drugs or alcohol. Nor did Dr. Morenz's evaluation provide any basis for establishing that Petitioner was unable to appreciate the consequences of his actions or to control his conduct. Second, the facts of the crime as relayed by Petitioner to Dr. Morenz reflect deliberate and methodical action to eliminate witnesses and destroy evidence as a means of avoiding apprehension. This clearly undermines any claim that Petitioner was unable to appreciate the wrongfulness of his conduct. Third, counsel believed an intoxication defense would "detract from the positive things we wanted to present about Lezmond." (Doc. 49, Ex. 2 at 41-43.) "Given the facts of the crimes and the lack of credible evidence of contemporaneous drug use impacting [Petitioner's] mental state, [counsel's] decision that a defense of diminished mental capacity was not feasible certainly fell 'within the wide range

of reasonable professional assistance.'" *Williams*, 384 F.3d at 617 (citing *Strickland*, 466 U.S. at 689).

Counsel also exercised reasonable professional judgment in not presenting evidence of Petitioner's executive functioning deficits. According to the neuropsychologist, Petitioner "appeared to have mild difficulty in certain components of executive functioning, specifically in planning and strategy formation. His difficulty was thought to be largely due to a tendency to respond impulsively and quickly." (Doc. 35-1 at 1-2.) Dr. Morenz characterized the deficits as "mild and of uncertain etiology and clinical significance." (Doc. 43, Ex. 94 at 18.) This is hardly helpful mitigation. *See West v. Ryan*, 608 F.3d at 489 (finding it reasonable for counsel not to introduce at sentencing an expert's "underwhelming report"). Moreover, as discussed next, presentation of such evidence would have opened the door to the admission of the remainder of Dr. Morenz's report, including his diagnosis of antisocial personality disorder.

*Potentially Damaging Rebuttal*

The decision not to present evidence of Petitioner's dysfunctional upbringing, drug and alcohol dependence, executive functioning deficits, and intoxication at the time of the crime was not unreasonable given the risk of opening the door to damaging rebuttal evidence. For example, counsel considered calling Sherry Mitchell as a witness, if only "to show what a piece of crap she was," but she was a "loose cannon" and they were concerned "she would have pointed a finger at Lezmond and basically condemned him right there." (Doc. 53-1 at 4; Doc. 49, Ex. 2 at 44-45.) She had also contacted investigators shortly after Petitioner's arrest and made remarks to the effect that "he was where he belonged." (Doc. 49, Ex. 2 at 45.) Similarly, enlisting an expert to testify to the social history compiled by Ockenfels would have likely required disclosure of many of the damaging facts contained in her report, including Petitioner's aggressive behavior in school throughout his childhood, his gang activities, and his abuse of animals, all of which the prosecution would undoubtedly have sought to elicit in rebuttal. Such evidence of Petitioner's violent tendencies would have been at odds with the positive portrait counsel wished to paint and would have undermined the

argument that it was Orsinger, not Petitioner, who instigated the violent attack on the victims. *See Burger v. Kemp*, 483 U.S. 776, 793 (1987) (finding reasonable counsel's decision not to present evidence of defendant's violent tendencies that was at odds with strategy of portraying defendant's actions as result of co-defendant's strong influence on his will); *Cox v. Ayers*, 613 F.3d 883, 897 (9th Cir. 2010) (finding reasonable decision not to present evidence suggesting violent propensities where goal was to portray defendant as less culpable than co-defendant).

Evidence highlighting Petitioner's addictions also could have hurt as much as helped the mitigation case. Courts have repeatedly observed that evidence of drug and alcohol abuse is often a "double-edged sword" because it is equally possible a sentencer will fault a defendant for his failure to effectively address an addiction problem or construe him as a continuing threat to society. *See, e.g.*, *Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 3387 (2010); *Tompkins v. Moore*, 193 F.3d 1327, 1338 (11th Cir. 1999).

Finally, testimony from Dr. Morenz concerning Petitioner's mild executive functioning deficits would have required disclosure of his report, which, in addition to detailing Petitioner's behavioral problems and animal abuse, revealed that Petitioner began selling drugs while in middle school and was seemingly unremorseful for the tragic deaths of Slim and her granddaughter. Bartolomei was concerned that this report would negatively affect the jury: "I don't think the jury would have been very sympathetic to hearing even more negative things about this young man." (Doc. 49, Ex. 2 at 32.) Additionally, Dr. Morenz diagnosed Petitioner as suffering from an antisocial personality disorder. The Ninth Circuit has repeatedly observed that such a diagnosis may be potentially more harmful than helpful. *See, e.g.*, *Daniels v. Woodford*, 428 F.3d 1181, 1204, 1210 (9th Cir. 2005) (indicating that testimony suggesting that a capital defendant is a sociopath" is aggravating rather than mitigating); *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (acknowledging that an antisocial personality diagnosis can be damaging to a capital defendant); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (noting that mental

health records omitted from the sentencing hearing "hardly turned out to be helpful" because they indicated that the defendant had an antisocial personality").

*Viable Defenses*

For the penalty phase, defense counsel selected witnesses whom they thought could "show [Petitioner's] humanity." (Doc. 49, Ex. 2 at 51.) Counsel met with each witness before his or her testimony, either at counsel's office or outside the courtroom to explain their goal of eliciting testimony about the witness's personal knowledge of Petitioner and his positive qualities. Counsel did not want the witnesses to testify about Petitioner's drug use, drug dealing, or dysfunctional upbringing. To the contrary, their strategy was to focus on Petitioner's future potential, the fact that he had good qualities and leadership skills, and to argue that his life was worth saving. (Doc. 49, Ex. 2 at 51-54.) This was not an unreasonable tactical decision.

Similarly, the Court cannot fault counsel's decision to focus on the disparity between Petitioner and Orsinger. Although Petitioner had conceded to Agent Duncan that he stabbed Slim a few times and tried to cut the young girl's throat, counsel reasonably argued that Orsinger was the more culpable participant because he had previously committed murder and instigated the attacks against Slim and her granddaughter. Thus, lingering doubt existed about the extent of Petitioner's role in the killings. The fact that Orsinger was not facing the death penalty was a powerful argument for mercy and proportionality in Petitioner's case. *See Pizzuto v. Arave*, 385 F.3d 1247, 1253 (9th Cir. 2004) (noting that the relative culpability of co-defendants is a well-recognized mitigating circumstance).

In sum, counsel made a significant effort, based on a reasonable investigation, to present to the jury a sympathetic portrait of Petitioner and to focus the jury's attention on reasons to spare Petitioner's life. Petitioner has not presented a sufficient basis to question the reasonableness of the sentencing strategy utilized by defense counsel, especially in the face of a difficult case. Consequently, Petitioner has not shown that counsel's performance was constitutionally deficient. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

unchallengable.”).

To establish ineffective assistance of counsel, a petitioner must also demonstrate prejudice from any deficiencies by counsel. Because Petitioner has not established deficient performance, the Court finds it unnecessary to address whether he was prejudiced by counsel’s decision not to present evidence of Petitioner’s dysfunctional family and life history, drug and alcohol dependence, executive functioning deficits, and state of mind at the time of the offense. *See id.* at 697 (stating that a court need not address both prongs of an ineffectiveness claim).

**B. Mental Competency (Claim S)**

At some point during trial, Petitioner told counsel that he was contemplating waiving his presence during any sentencing proceedings. (RT 5/9/03 at 3616.) Shortly after the jury returned its guilty verdict, counsel informed the Court that Petitioner had become uncooperative, no longer wanted to participate in his defense, wanted to waive his appearance, and would not be testifying during the penalty phase. (RT 5/8/03 at 3589-91.) After numerous attempts to change Petitioner’s mind over the course of several days, the Court ultimately accepted the waiver after determining that Petitioner’s decision was knowing, intelligent, and voluntary. (RT 5/8/03 at 3598-99; RT 5/9/03 at 3604-10; RT 5/13/03 at 3664-69; RT 5/14/03 at 3841-51.) Throughout the penalty phase, the Court frequently verified that Petitioner continued to waive his presence. (RT 5/15/03 at 3886, 3950; RT 5/16/03 at 4054, 4107, 4169.) Petitioner observed the proceedings over a closed-circuit TV in a holding cell adjacent to the courtroom and appeared in court only for return of the sentencing verdicts. (RT 5/16/03 at 4169; RT 5/20/03 at 4195.)

In his § 2255 motion, Petitioner argues that counsel were ineffective for not asserting that he was mentally incompetent, due to his drug addiction, to waive presence at sentencing. (Doc. 30 at 221.) He has proffered two affidavits from inmates who were housed in the same jail as Petitioner at the time of Petitioner’s trial. One claims that he saw Petitioner use heroin and drink jail-brewed alcohol on a regular basis. (Doc. 12, Ex. 97.) The other asserts that he saw Petitioner use heroin and marijuana regularly, take other drugs such as crystal

methamphetamine and cocaine periodically, and drink homemade liquor daily. (Doc. 55, Ex. 161.) In addition, he asserts that Dr. Morenz's report put counsel on notice of both Petitioner's history of drug and alcohol abuse and his access to drugs and alcohol while in jail. Therefore, Petitioner argues, counsel should have requested a competency hearing once Petitioner refused to participate in the penalty phase.

An attorney has a duty to inquire into a defendant's competency and request a competency hearing if there is indicia of incompetence that "would provide reasonable counsel 'reason to doubt' the defendant's ability to understand the proceedings, communicate with counsel, and assist in his own defense." *Jermyn v. Horn*, 266 F.3d 257, 300 (3d Cir. 2001). After considering the facts available to counsel, the Court concludes that Petitioner's ineffectiveness claim fails.

On direct appeal, Petitioner argued that this Court erred in not *sua sponte* holding a hearing to determine whether he was mentally competent to waive his presence. In rejecting the claim, the Ninth Circuit concluded that there was no reasonable doubt as to Petitioner's competency:

> It is clear from the record that Mitchell understood the nature of the proceedings and that his chances of avoiding the death penalty could ride on his presence. He points to no psychiatric evidence that he was somehow clinically incompetent. Finally, Mitchell was not disruptive, did not launch into emotional outbursts, maintained appropriate demeanor, and did not behave erratically. *Cf. Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000) (describing bizarre courtroom conduct by a habeas petitioner who had been diagnosed with a severe delusional disorder, which included wearing jailhouse blues; threatening to assault his attorney; continually disrupting the proceedings; and insisting that he be handcuffed as well as shackled). In short, Mitchell gave the judge no "reason to doubt [his] competence." *Godinez v. Moran,* 509 U.S. 389, 402 n.13, 113 S. Ct. 2680, 125 L.Ed.2d 321 (1993).
>
> While Mitchell recognized that his decision might be self-defeating, he made it anyway. The court did its best to talk Mitchell out of doing something that it believed was imprudent and not in his best interests. Mitchell acknowledged what the court, and his counsel, thought but, as he put it at one point, "Isn't that my decision?" As manifest by the extensive exchanges, Mitchell was alert, understood what he was doing, and gave no hint of lacking a rational grasp on the proceedings.

*Mitchell*, 502 F.3d at 986-87.[14]

The only new evidence Petitioner proffers that was not before the appellate court are two declarations from prisoners claiming they observed Petitioner consume drugs and alcohol while in jail pending trial. However, neither of these individuals was at the same detention facility when the guilt phase of Petitioner's trial concluded in May 2003. One was transferred out of the jail in April 2003 while the other states that he was sentenced and sent to prison before Petitioner's trial concluded. (Doc. 12, Ex. 97 at 1; Doc. 55, Ex. 161 at 4.)

Moreover, in their depositions, counsel denied having any reason to suspect that Petitioner was intoxicated during the trial or mentally incompetent to waive his presence at sentencing. Sears stated that Petitioner was "engaged, appropriate, understood, or at least appeared to understand all of what was being discussed in his presence." (Doc. 49, Ex. 3 at 20.) He also noted that he had experience with incompetent clients and would have known whether Petitioner was under the influence of drugs or alcohol. (*Id.* at 21-22, 28-29.) Williams likewise testified that he never smelled alcohol and that Petitioner was "always linear" in his thinking. (Doc. 49, Ex. 1 at 25-26, 50.) Bartolomei was surprised to see a reference in Dr. Morenz's report to substance abuse in jail because Petitioner was housed in a highly restricted area and had very limited access to other inmates. (Doc. 49, Ex. 2 at 26-27, 64-65.) He also observed no signs of intoxication and no reason to suspect that Petitioner did not understand what was going on, stating that nothing "raised a red flag" even after Petitioner refused to participate in the penalty phase. (*Id.* at 12, 48-49.)

Because there was nothing to alert counsel that their client may have been incompetent, the failure to request a competency hearing was not constitutionally deficient. *See Boyde v. Brown*, 404 F.3d 1159, 1167 (9th Cir. 2005) (finding no ineffectiveness where there was no substantial basis for questioning defendant's competence); *de Kaplany v. Enomoto*, 540 F.2d 975, 986-87 (9th Cir. 1976) (finding no ineffectiveness where counsel

---

[14] To the extent Petitioner is reasserting in his petition that the Court should have *sua sponte* ordered a mental competency hearing, the Court declines to consider the issue because it was raised and decided on direct appeal. *See Polizzi*, 550 F.2d at 1135-36.

had no reason to doubt defendant's competency and available psychiatric reports did not suggest incompetence).

## III. CONFLICT OF INTEREST

In Claim C of his motion to vacate, Petitioner alleges that his right to effective assistance of counsel was violated because a conflict of interest prevented trial counsel from "thoroughly investigat[ing]" his case. (Doc. 30 at 100.) Specifically, he contends that "the Federal Public Defender's Office represented two clients who had actively conflicting interests though they were not co-defendants in the same case." (*Id.*) He further asserts that "[a]t some point before trial, Assistant Federal Public Defender Karen M. Wilkinson notified Federal Public Defender Jon Sands that she was representing a client who had some involvement in the Mitchell case." (*Id.*) According to Petitioner, Sands directed Wilkinson to withdraw as counsel from her case and erected an "ethical wall" around her, prohibiting her from disclosing any information about her former client. (*Id.*) Petitioner also argues that discovery is necessary to compel the FPD to disclose the basis of the conflict.

### A. Relevant Facts

Petitioner's claim rests entirely on a declaration of his appellate counsel, Celia Rumann, who for some period during Petitioner's appeal proceeding was also employed as an Assistant FPD in Arizona. Rumann states that in 2007, prior to the Ninth Circuit's ruling on September 5, 2007, she discovered that Wilkinson "had to withdraw from a case because she had learned that her client had some relationship to the *Lezmond Mitchell* case." (Doc. 12, Ex.115 at 1.) Rumann further declares that she emailed Wilkinson and Sands in August 2007 requesting further information about the conflict, including the identity of the person Wilkinson had represented and when and how the conflict had been discovered. According to Rumann, Wilkinson told her she had been instructed not to discuss the matter. Subsequently Rumann met with FPD Sands and trial counsel Bartolomei, who acknowledged that Wilkinson had withdrawn from the other client's case, did not believe there was a conflict for Rumann, but would not stop Rumann if she sought to withdraw from the appeal.

In her declaration, Rumann further states that "another deputy in the office, possibly

Karen Wilkinson, [] told me that a 'wall' was between me and the trial attorneys, that is, the Office [of the FPD] created an information barrier to keep me from learning privileged information from the trial team, and, I assume, vice versa." (*Id.* at 3.) Rumann also states that a wall must have been in existence because she learned, after filing Petitioner's appellate briefs, that the FPD had case-related boxes in storage and when she reviewed those materials discovered items she had never seen before, such as hard copies of the jurors' questionnaires and counsel's notes of the jury interviews. (*Id.* at 4-5.)

In his deposition, Bartolomei clarified that the conflict issue arose *after* Petitioner had been convicted and the case was on appeal. (Doc. 49, Ex. 2 at 83.) He also denied that there was an ethical wall around either Wilkinson or Rumann, other than Wilkinson being advised not to discuss her case, and said he had turned over all of his case materials to Rumann. (*Id.* at 63, 84 & attached clarification). Bartolomei further denied knowing the identity of Wilkinson's client and asserted attorney-client privilege in response to questions concerning Wilkinson's case.

**B. Analysis**

To establish an ineffectiveness claim based on a conflict of interest, it is not sufficient to show that a "potential" conflict existed. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). Rather, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). An actual conflict of interest for Sixth Amendment purposes is one that "adversely affects counsel's performance." *Mickens*, 535 U.S. at 171. The Ninth Circuit has held that "[t]he showing must be that counsel was influenced in his basic strategic decisions by loyalty to another client or former client." *United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (internal citation omitted).

In his motion to vacate, Petitioner asserts summarily that the FPD's "restrictions on trial counsel prevented them from looking into how Wilkinson's unnamed [client] affected the investigation of this case. Thus the conflict adversely affected their performance." (Doc. 30 at 100-01.) However, Bartolomei's deposition testimony established that the alleged

conflict did not arise until *after* Petitioner was convicted, and Petitioner has proffered no evidence to the contrary. This time-line is supported by the fact that Jon Sands was not appointed as Federal Public Defender until December 2003 (months after Petitioner's conviction) and, therefore, could not have prohibited Wilkinson from disclosing information about her former client "before trial" as alleged by Petitioner in this claim. Simply put, trial counsel's investigation and preparation for trial could not have been affected by an alleged conflict that arose after he was already convicted and sentenced.

Although his § 2255 motion refers only to trial counsel, in the concluding paragraph of Claim C Petitioner asserts that the alleged conflict also adversely affected appellate counsel Rumann. (*See* Doc. 30 at 103.) In addition, Petitioner's reply brief asserts that a dispute of fact exists as to whether Rumann was walled off from the deputies who tried his case and that discovery and an evidentiary hearing are therefore necessary to resolve this claim. (Doc. 55 at 19.) The Court disagrees.

A discovery request in a habeas case will not be granted unless it is supported by specific factual detail. *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (upholding denial of discovery request where petitioner failed to allege facts that, if established, would entitle him to relief); *see also Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970) ("Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence."). In addition, a petitioner is entitled to a hearing on a conflict of interest claim only if he alleges "specific facts which, if true, would indicate that: (1) an attorney's relationship to a third party influenced the attorney not to pursue a particular litigation strategy, and (2) the foregone litigation strategy would have been a viable alternative." *Rodrigues*, 347 F.3d at 824. "This standard requires the defendant to do more than simply allege a 'conflict' or baldly assert that the asserted conflict had an 'adverse effect.'" *Id.*

Here, Petitioner fails to allege specifically how Rumann's performance was adversely affected by the alleged conflict with Wilkinson's client. Although the identity of the client is unknown, there appears to be no dispute that Wilkinson's representation was limited and

that she withdrew upon learning that her client had some connection to Petitioner's case. In addition, Rumann states that she learned of the Wilkinson matter in 2007, shortly before the Ninth Circuit decided Petitioner's appeal. Thus, the existence of the alleged conflict could have had no impact on Petitioner's appeal, both because the briefing had already been completed and because appellate counsel was necessarily limited to raising issues based on the existing court record. *See* Fed. R. App. P. 28(a)(7) (requiring brief to contain "a statement of facts relevant to the issues submitted for review with appropriate references to the record"). Similarly, even if the FPD purposefully walled off Rumann from information concerning Wilkinson's case, Petitioner has failed to allege with any specificity how this adversely affected her representation on appeal.

Having reviewed Claim C and the allegations and supporting material submitted therewith, the Court concludes that the discovery and hearing Petitioner seeks will not assist him in demonstrating entitlement to relief based on an alleged conflict of interest. Merely establishing that counsel had a potential conflict of interest is insufficient to provide relief where there is no showing that, due to the conflict, some "plausible alternative defense strategy or tactic might have been pursued but was not." *Foote v. Del Papa*, 492 F.3d 1026, 1029-30 (9th Cir. 2007). Claim C is denied as meritless.

## IV. PROCEDURAL ISSUES

### A. Statute of Limitations

A motion by a federal prisoner for relief under § 2255 is subject to a one-year time limitation that generally runs from "the date on which the judgment of conviction becomes final." 28 U.S.C. 2255(f)(1). A judgment is final when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003); *see also United States v. Aguirre-Ganceda*, 592 F.3d 1043, 1045 (9th Cir.), *cert. denied*, 130 S. Ct. 3444 (2010). Although a prisoner has the right under Rule 15 of the Federal Rules of Civil Procedure to file an amended petition as a matter of right before the filing of a responsive pleading, untimely claims raised in an amendment relate back to

timely-filed ones only when they are "tied to a common core of operative facts"; untimely claims do not relate back if they arise out of "events separate in 'both time and type' from the originally raised episodes." *Mayle v. Felix*, 545 U.S. 644, 657 (2005).

In this case, the Supreme Court denied Petitioner's certiorari petition on June 9, 2008, *Mitchell*, 128 S. Ct. at 2902, and Petitioner timely filed his § 2255 motion on June 8, 2009. On November 12, 2009, before the Government submitted its response, Petitioner filed an amended § 2255 motion. One of the changes contained in the amended petition was the addition of new Claim N, which alleges that Petitioner's right to a jury of his peers was violated when the Court transferred the case from Prescott to Phoenix due to security concerns regarding Orsinger and failed to transfer the case back to Prescott after severing Petitioner's and Orsinger's trials. (Doc. 30 at 190-92.) The Government now contends that Claim N should be dismissed as untimely. (Doc. 49 at 54.)

Petitioner argues that Claim N relates back to original Claim M (redesignated as Claim O in the amended petition). (Doc. 55 at 49.) In that claim, Petitioner asserted that his right to a fair and representative jury was violated when Native Americans were systematically excluded from jury service. (Doc. 9 at 136.) His argument was based, in part, on the fact that the case had been transferred to Phoenix and that the later severance of Orsinger's and Petitioner's cases eliminated the reason for the transfer. (*Id.* at 137.) The Court finds Claim N timely because it relates back to a substantially-similar allegation contained within his original § 2255 motion. However, as discussed next, the Court declines to address the claim because it was previously raised on appeal.

**B. Claims Previously Raised on Appeal**

A district court may refuse to consider any claim raised in a § 2255 motion that was previously presented and considered on direct appeal. *Polizzi v. United States*, 550 F.2d 1133, 1135-36 (9th Cir. 1976). A claim was previously presented if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments." *Molina v. Rison*, 886 F.2d 1124, 1129 (9th Cir. 1989). A court may entertain a successive claim if the law has changed or if necessary to

serve the ends of justice. *Polizzi*, 550 F.2d at 1135-36.

Respondents assert that Claims I, N, O, Q, R, W, X, and Z were previously raised on direct appeal and are thus precluded from review by this Court. (Doc. 49 at 37, 54, 55, 58, 61, 69, 70, 73.) As set forth next, the Court concludes that Petitioner raised each of these claims on direct appeal, that none rely on a change in the law, and that the ends of justice do not warrant their re-examination.

In Claim I Petitioner contends that he was deprived of his right to an impartial jury when Venireperson 3 was excluded because of his views opposing the death penalty. Because Petitioner waited until his appellate reply brief to raise this claim, the Ninth Circuit deemed it waived. *See Mitchell*, 502 F.3d at 953 n.2. The appellate court's waiver ruling does not negate the fact that Petitioner has raised in these proceedings the same legal claim that was presented on appeal.[15] Thus, the claim is impermissibly successive.

In Claim N Petitioner alleges that his right to a representative jury was violated when the Court failed to transfer his case back to the Prescott division after severing Orsinger's trial. On appeal, Petitioner asserted a fair-cross-section violation. While he alleged that his trial was improperly transferred, he "abandon[ed] the point by developing no argument with respect to it." 502 F.3d at 950. He also complained that the last-minute severance "dramatically changed the nature of the case for which he was selecting a jury." *Id.* at 959. The Court can discern no basis for exempting Claim N from the presumption against reconsideration of a claim raised on appeal.

In Claim O Petitioner asserts that his right to a jury chosen from a fair and representative jury venire was violated when Native Americans were systemically excluded from jury service. Petitioner raised this same claim on direct appeal. The Ninth Circuit concluded that he had failed to "show that the underrepresentation of Native Americans on venires such as his was either substantial or systematic." *Mitchell*, 502 F.3d at 951.

---

[15] In Section I.F.4 above, the Court rejected Petitioner's assertion that appellate counsel was ineffective for not properly presenting on appeal a *Witherspoon* challenge to Venireperson 3.

Petitioner does not allege a manifest injustice or change in the law; rather, he asserts only that the Ninth Circuit erred in relying on absolute disparity instead of a standard deviation analysis. This is insufficient to overcome the presumption against consideration of successive claims.

In Claim Q Petitioner argues that the Government failed to disclose a letter from the Attorney General of the Navajo Nation indicating the Nation's opposition to capital punishment in general and in Petitioner's case.[16] The Ninth Circuit denied this claim on direct appeal, finding that any disclosure violation was harmless. *Id.* at 989. In the instant motion, Petitioner argues only that the alleged violation prejudiced his sentencing. Again, this is insufficient to overcome the presumption against consideration of successive claims.

In Claim R Petitioner asserts that federal investigators colluded with Navajo Nation law enforcement to violate his Fifth and Sixth Amendment rights. Petitioner acknowledges that this claim was litigated on direct appeal, *see id.* at 960-63, but asserts that the Ninth Circuit's analysis was limited to the record and that the claim must be reevaluated in light of new evidence concerning counsel's failure to "appropriately challenge" his custodial statements. (Doc. 55 at 53.) Petitioner's claim clearly rests on the same ground as that presented on appeal and is therefore impermissibly successive. *See Molina*, 886 F.2d at 1128 ("*Sanders* [*v. United States*, 373 U.S. 1 (1963),] states that an involuntary confession claim is still the same 'ground' even if the present claim is based on factual premises that are very different from those on which the earlier claim was based.").

In Claims W, X, and Z Petitioner alleges that the Federal Death Penalty Act is applied inconsistently, impermissibly discriminates against minorities, and fails to provide

---

[16] In Claim Q Petitioner also asserts that the Government located and began processing the crime scene prior to being led to the site by either Petitioner or Orsinger, contrary to testimony at trial. (Doc. 30 at 202.) This claim is based on information provided to habeas counsel by a law enforcement officer who refused to sign a declaration; therefore, according to Petitioner, discovery and a hearing to explore this claim are necessary. (*Id.* at 202 n.27.) However, unsupported or speculative allegations are insufficient to justify an evidentiary hearing. *Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994).

constitutionally-required plain-error review. He presented the same arguments to the Ninth Circuit, which rejected each. *See Mitchell*, 502 F.3d at 982, 983 & 967 n.10.

Because Claims I, N, O, Q, R, W, X, and Z were previously raised on direct appeal and Petitioner has not alleged that any are based on a change in law or that a manifest injustice will occur if the claims are not addressed on the merits, the Court declines to reconsider them in these proceedings.

**C. Claims that Could Have Been Raised on Appeal**

A § 2255 motion is an "extraordinary remedy" and "'will not be allowed to do service for an appeal.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994)). Consequently, "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice' or that he is 'actually innocent.'" *Id.* at 622 (citations omitted); *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993). To establish cause for a procedural default, a petitioner must show, for example, that the claim rests upon a new legal or factual basis that was unavailable at the time of direct appeal, that interference by officials prevented the claim from being brought earlier, or that counsel rendered constitutionally ineffective assistance. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *United States v. Braswell*, 501 F.3d 1147, 1150 (9th Cir. 2007). If cause is established, a petitioner must further establish prejudice by demonstrating "not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional magnitude." *Braswell*, 501 F.3d at 1150 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Respondents contend that Petitioner could have raised Claims J, L, M, P, and Y on direct appeal and thus these claims are procedurally defaulted. (Doc. 49 at 44, 52, 53, 57, 73.) Petitioner asserts that appellate counsel's ineffectiveness in not raising these claims constitutes cause to overcome any default. He also asserts an independent ineffectiveness claim based on appellate counsel's ineffectiveness in failing to raise these claims (Claim AA). (Doc. 30 at 264.)

Appellate counsel is not constitutionally required to "raise every 'colorable' claim." *Jones v. Barnes*, 463 U.S. 745, 754 (1983). "A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court." *Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997). Therefore, whether appellate counsel acted unreasonably in failing to raise a particular issue is often intertwined with the merits of the issue and whether the defendant would have prevailed on appeal. *See Wildman*, 261 F.3d at 840.

Claims J, L, M, and P relate to jury selection. Specifically, Petitioner argues that the Court failed to enforce the legal standard for hardship dismissals, that voir dire was inadequate, that the cumulative effect of all errors during the jury selection process deprived him of due process, and that the juror questionnaire was inadequate. In Claim Y, Petitioner asserts in a conclusory manner that his capital sentence is unconstitutionally discriminatory. After reviewing these claims, the Court concludes that none would have succeeded on appeal because Petitioner has shown neither persuasive legal authority demonstrating error nor prejudice from the alleged errors. Thus, appellate counsel was not ineffective in failing to raise them and appellate ineffectiveness does not excuse Petitioner's procedural default. Claims J, L, M, P, and Y are procedurally barred.

**D. Challenge to Court's Request to Interview Jurors**

In Claim K Petitioner argues that the Court violated his constitutional rights during these § 2255 proceedings by denying his motion to interview jurors because such interviews "are a vital part of the investigative process." (Doc. 30 at 177.) Because this claim alleges error in a postconviction proceeding, not at trial or sentencing, the Court concludes that it fails to state a cognizable claim for relief under § 2255. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir. 2006) (concluding that delay in § 2255 proceeding "does not give rise to an independent due process claim that would justify granting a defendant habeas relief."). Claim K fails to state a ground for relief.

**E. Lethal Injection Claim**

In Claim V, Petitioner alleges that execution using Arizona's current lethal injection protocol would violate his rights under the Eighth Amendment. However, he acknowledges that this claim is not yet ripe and that he may present it in a separate civil rights action under 42 U.S.C. § 1983. (Doc. 30 at 241.) The Court agrees and therefore dismisses Claim V without prejudice. *See Mitchell*, 502 F.3d at 983 (declining to reach the issue and citing *Hill v. McDonough*, 547 U.S. 573, 579-80 (2006), which recognized that challenge to execution method may be brought in § 1983 action).

**CONCLUSION**

The Court determines that Petitioner has failed to allege facts that, if true, would entitle him to relief. Therefore, an evidentiary hearing is neither required nor warranted. For the reasons set forth herein, the Court further concludes that Petitioner is not entitled to relief under 28 U.S.C. § 2255. Accordingly, his motion is denied.

**CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 11of the Rules Governing Section 2255 Proceedings, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the

denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of the following claims:

> Claim A – Whether counsel's failure to investigate, prepare, and present evidence of intoxication resulted in ineffective assistance at trial;
>
> Claim B – Whether counsel's failure to investigate, prepare, and present evidence of addiction and intoxication resulted in ineffective assistance at sentencing; and
>
> Claim D – Whether counsel's failure to investigate, prepare, and present evidence of Mitchell's social history and executive functioning deficits resulted in ineffective assistance at sentencing.

For the reasons stated in this Order, the Court declines to issue a COA with respect to any other claims or procedural issues.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Or, in the Alternative, Pursuant to 28 U.S.C. § 2241 (Dkt. 30) is **DENIED**. The Clerk of Court shall enter judgment accordingly and terminate this action.

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

> Claim A – Whether counsel's failure to investigate, prepare, and present evidence of intoxication resulted in ineffective assistance at trial;
>
> Claim B – Whether counsel's failure to investigate, prepare, and present evidence of addiction and intoxication resulted in ineffective assistance at sentencing; and
>
> Claim D – Whether counsel's failure to investigate, prepare, and present evidence of Mitchell's social history and executive functioning deficits resulted in ineffective assistance at sentencing.

DATED this 30th day of September, 2010.

Mary H. Murguia
United States District Judge